# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CONNECT AMERICA HOLDINGS, LLC,** | : | |
| **CONNECTAMERICA.COM, LLC,** *and* | : | |
| **KENNETH GROSS,** | : | **CIVIL ACTION** |
| | : | |
| *Plaintiffs*, | : | **NO. 14-4784-TJS** |
| | : | |
| **v.** | : | |
| | : | |
| **ARCH INSURANCE COMPANY** | : | |
| | : | |
| *Defendant*. | : | |
| | : | |

## DEFENDANT ARCH INSURANCE COMPANY'S BRIEF
## IN SUPPORT OF ARCH'S MOTION FOR SUMMARY JUDGMENT

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER

Ronald P. Schiller
Daniel J. Layden
Matthew N. Klebanoff
One Logan Square, 27th Floor
Philadelphia, Pennsylvania 19103
(215) 568-6200
(215) 528-0300 facsimile
rschiller@hangley.com
dlayden@hangley.com
mklebanoff@hangley.com

*Attorneys for Defendant*
*Arch Insurance Company*

I. INTRODUCTION ................................................................................................ 1

II. OVERVIEW OF UNDISPUTED MATERIAL FACTS ....................................... 3

III. ARGUMENT ..................................................................................................... 4

 A. Summary Judgment Legal Standard .................................................. 5

 B. Under Pennsylvania Law, Language in an Insurance Policy Must be Interpreted According to its "Natural, Plain and Ordinary" Meaning.................................................. 5

 C. There is No Coverage Under the Arch Policy for the 2013 Action Because it is Not a Claim First Made During the Policy Period and is Barred Under the Interrelated Claims Provision and Prior Acts Exclusion ........................................................................... 6

  1. *The Interrelated Claims Provision and the Prior Acts Exclusion* ............................... 6

  2. *Courts Interpret "Interrelated Wrongful Acts" Broadly and in the Context of the Facts and Claim Actually Before the Court*............................... 8

  3. *The 2013 Action Alleged Wrongful Acts That are Interrelated with the Wrongful Acts Alleged in the 2008/2009 Action and 2004 Cease and Desist Letter Such that there is No Coverage Available Under the Policy*.................................... 10

   i. *The Allegations In The 2008/2009 Action and 2013 Action Share A Common Nexus Of Any Fact, Circumstance, Event, Transaction, Cause Or Series Of Causally Connected Facts, Circumstances, Events, Transactions Or Causes* ..... 11

   ii. *Plaintiffs' Argument that the Allegations in the 2013 Action Do Not Share a "Common Nexus" with the Allegations in the 2008/2009 Action Because the Method of Infringement was not Identical Finds No Support in the Policy Language Or Case Law* ...................................................................... 13

   iii. *Plaintiffs' Allegation in its Complaint that the 2008/2009 Action Did Not Involve a False Advertising Claim Based on Connect America Falsely Advertising its Length of Time in Business is Incorrect and Would Not Defeat Interrelatedness In Any Event* .......................................................... 19

   iv. *Connect America's Allegation in its Complaint that Life Alert "Did Not Allege a Violation of the [2009] Permanent Injunction" is (1) Incorrect and (2) Has No Impact Regarding Interrelatedness* ................................................. 20

4. *The Allegations In The 2004 Cease And Desist Letter And 2013 Action Share A Common Nexus Of Any Fact, Circumstance, Event, Transaction, Cause Or Series Of Causally Connected Facts, Circumstances, Events, Transactions Or Causes.* ..... 23

D. Plaintiff Kenneth Gross Has No Claim for "Non-Indemnifiable Loss" Under D&O Insuring Agreement A. "Insured Person Liability" .......................................................... 24

E. The Trademark Infringement Exclusion Bars Coverage for Connect America Holdings and Connect America Under Insuring Agreement B. "Organization Reimbursement" and Insuring Agreement C. "Organization Liability" ....................................................... 26

1. *D&O Insuring Agreement B. "Organization Reimbursement" and D&O Insuring Agreement C. "Organization Liability"* ..................................................... 26

2. *The Trademark Infringement Exclusion Bars Coverage in Full for Connect America Holdings and Connect America* ................................................................. 27

F. Coverage is Barred by the Prior Knowledge Exclusion .................................................. 32

IV. CONCLUSION ....................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*4th St. Investments, LLC v. Dowdell,*
  340 F. App'x 99 (3d Cir. 2009) ............................................................................................8

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ..............................................................................................................5

*Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.,*
  855 P.2d 1263 (Cal. 1993) ...................................................................................................10

*Buckley v. Exodus Transit & Storage Corp.,*
  744 A.2d 298 (Pa. Super. Ct. 1999) ...............................................................................8, 25

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ..............................................................................................................5

*Citizens Ins. Co. of Am. v. Uncommon, LLC,*
  812 F. Supp. 2d 905 (N.D. Ill. 2011) ..................................................................................29

*Cont'l Cas. Co. v. Wendt,*
  205 F.3d 1258 (11th Cir. 2000) .......................................................................................9, 17

*Ettinger & Associates, LLC v. Hartford/Twin City Fire Ins. Co.,*
  CIV.A. 12-3274, 2014 WL 2134599 (E.D. Pa. May 22, 2014) ...........................................33

*Fishman v. Hartford,*
  980 F. Supp. 2d 672 (E.D. Pa. 2013) ..................................................................................33

*Forum Ins. Co. v. Allied Sec., Inc.,*
  866 F.2d 80 (3d Cir. 1989) ..................................................................................................28

*Gregory v. Home Ins. Co.,*
  876 F.2d 602 (7th Cir. 1989) ...............................................................................................10

*Hammond v. U.S. Liab. Ins. Co.,*
  No. 14CV0847, 2015 WL 401503 (W.D. Pa. Jan. 28, 2015) ..............................................28

*Highwoods Properties v. Executive Risk Indem.,*
  407 F.3d 917 (8th Cir. 2005) ...........................................................................................9, 17

*In re Bressman,*
  327 F.3d 229 (3d Cir. 2003) ..................................................................................................5

*Marvin J. Perry, Inc. v. Hartford Cas. Ins. Co.,*
  412 F. App'x 607 (4th Cir. 2011) .........................................................................................29

*Mega Const. Corp. v. Quincy Mut. Fire Ins. Co.*,
    42 F. Supp. 3d 645 .............................................................................................28

*Meyer v. CUNA Mut. Ins. Soc.*,
    648 F.3d 154 (3d Cir. 2011)..............................................................................6

*OneBeacon Am. Ins. Co. v. Urban Outfitters, Inc.*,
    21 F. Supp. 3d 426 (E.D. Pa. 2014) .................................................................5

*Parameter Driven Software, Inc. v. Mass. Bay Ins. Co.*,
    25 F.3d 332 (6th Cir. 1994) .............................................................................29

*Seneca Ins. Co. v. Kemper Ins. Co.*,
    133 Fed. App'x. 770 (2d Cir. 2005)..................................................................9

*State Farm Fire & Cas. Co. v. Estate of Mehlman*,
    589 F.3d 105 (3d Cir. 2009)............................................................................25

*Superformance Int'l, Inc. v. Hartford Cas. Ins. Co.*,
    332 F.3d 215 (4th Cir.2003) ......................................................................29, 30

*Szaferman, Lakind, Blumstein & Blader PC v. Westport Ins. Corp.*,
    518 F. App'x 107 (3d Cir. 2013) ......................................................................9

*Tyler v. Motorists Mut. Ins. Co.*,
    779 A.2d 528 (Pa. Super. Ct. 2001) .............................................................6, 10

*U.S. ex rel. Thomas v. Siemens AG*,
    991 F. Supp. 2d 540 (E.D. Pa. 2014) (Savage, J.), *aff'd*, 593 F. App'x 139 (3d Cir.
    2014) .................................................................................................................5

*Viera v. Life Ins. Co. of N. Am.*,
    642 F.3d 407 (3d Cir. 2011)..............................................................................6

*W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co.*,
    No. GJH-14-00425, 2014 WL 5812316 (D. Md. Nov. 7, 2014) ...................8, 13, 17

*Westport Ins. Corp. v. Hanft & Knight, P.C.*,
    523 F. Supp. 2d 444 (M.D. Pa. 2007) .............................................................33

*Westport Ins. Corp. v. Mirsky*,
    No. CIV.A. 00-4367, 2002 WL 31018554 (E.D. Pa. Sept. 10, 2002), *aff'd*, 84 F.
    App'x 199 (3d Cir. 2003) ..................................................................................8

*Zodiac Grp., Inc. v. Axis Surplus Ins. Co.*,
    542 F. App'x 844 (11th Cir. 2013)....................................................................9

*Zunenshine v. Executive Risk Indem. Inc.*,
    1998 U.S. Dist. LEXIS 12699 (S.D.N.Y. Aug. 17, 1998) ........................................................9

**STATUTES**

15 U.S.C. § 1125(a)… ....................................................................................... passim

**OTHER AUTHORITIES**

Fed. R. Rule 26(a) ...........................................................................................................19

Fed. R. Civ. P. 56 .............................................................................................................1

Fed. R. Civ. P. 56(a) ........................................................................................................5

Fed R. Civ. P. 56(c)(1) .....................................................................................................5

## DEFENDANT ARCH INSURANCE COMPANY'S BRIEF
## IN SUPPORT OF ARCH'S MOTION FOR SUMMARY JUDGMENT

Defendant Arch Insurance Company ("Arch") files this Brief in Support of its Motion for Summary Judgment. For the reasons set forth below, Arch respectfully requests that the Court enter summary judgment pursuant to Fed. R. Civ. P. 56 in favor of Arch, and against Plaintiffs Connect America Holdings, LLC ("Connect America Holdings"), ConnectAmerica.com, LLC ("Connect America"), and Kenneth Gross ("Gross") (collectively, "Plaintiffs").

## I.       INTRODUCTION

In this insurance coverage dispute, Plaintiffs seek coverage from Arch for their defense and settlement of a lawsuit filed against them by Life Alert Emergency Response, Inc. ("Life Alert") in the U.S. District Court for the Central District of California captioned *Life Alert Emergency Response, Inc. v. Connect America.com LLC, et al.*, No 13-CV-3455 (C. D. Cal. 2013) (the "2013 Action"). Specifically, Plaintiffs seek coverage for approximately $200,000 in unallocated defense costs and a $2.5 million settlement payment in the 2013 Action under Arch's Corporate Canopy Policy -- Private Company Management Liability & Crime Insurance Policy No. PCD0042010-02, issued to Connect America Holdings with a policy period of December 24, 2012 to December 24, 2013 (the "Policy").[1]

Simply put, Life Alert alleged in the underlying litigation that Plaintiffs engaged in a continuous pattern for over a decade of misleading the public into thinking Connect America was the "Help, I've Fallen and Can't Get Up" company through infringing on Life Alert's trademarks and stating to consumers that Connect America was "in business since 1977" when clearly, and

---

[1]     Plaintiffs also seek in this lawsuit recovery from Arch for a $2.5 million payment Connect America made under an Escrow Agreement they entered into with Life Alert. However, as detailed in the undisputed facts set forth below, that payment was never presented to Arch for coverage or consent, did not include a release of claims, and is a voluntary payment and not **Loss**. As such, Plaintiffs' demand for coverage was at all times limited to its defense and settlement of the 2013 Action, which was released for a payment of $2.5 million under the Settlement Agreement.

by Plaintiffs' own admission, it was not.   These accusations – made in 2004, 2008, 2009 and 2013 – are consistent and their common nexus is not subtle:  Each and every time Connect America was accused of passing itself off as Life Alert through using and diluting Life Alert's trademarks and falsely advertising that Connect America was in existence nearly three decades longer than it actually had been in order to confuse and deceive consumers.

Based on these and other undisputed facts, and as a matter of fact and law, coverage is not available under the Arch Policy.

*First*, the allegations of trademark infringement and derivative misconduct (*i.e.,*trademark dilution, unfair competition and false advertising) against Plaintiffs in the 2013 Action share a "common nexus" of facts and circumstances with earlier allegations of trademark infringement and derivative misconduct (*i.e.,*trademark  dilution, unfair competition and false advertising) raised by Life Alert.  Accordingly, the 2013 Action is simply not a **Claim** first made within the Arch **Policy Period**. [2]

*Second*, Plaintiff Kenneth Gross has not paid any sum toward his defense or settlement of the 2013 Action and has, in fact, been fully indemnified by Connect America.  Thus, he has not incurred any **Non-Indemnifiable Loss** to possibly trigger any individual coverage under the Policy.

*Third,* coverage for Connect America Holdings and Connect America is barred under a broad Policy exclusion precluding **Loss** "arising from, based upon, or attributable to" allegations of Plaintiffs' trademark infringement.

---

[2] **Bolded** terms are defined in the Policy and are bolded here for consistency.

*Fourth*, Plaintiffs' prior knowledge of the same and similar allegations from Life Alert of trademark infringement, unfair competition, false advertising and Lanham Act violations bars coverage under the Policy and as a matter of Pennsylvania law.

## II. OVERVIEW OF UNDISPUTED MATERIAL FACTS

The facts supporting Arch's motion for summary judgment are set forth separately in Arch's Statement of Undisputed Facts ("SOF") which is incorporated herein. Arch reserves its right to advance additional facts and evidence in response to Plaintiffs' statement of facts submitted in connection with their motion for summary judgment, if any.

In summary, as more fully set forth in Arch's Statement of Undisputed Facts, beginning in 2004 and continuing through 2013 Life Alert accused Connect America and Kenneth Gross of infringing on Life Alert's trademarks and making misleading claims in an effort by Connect America to confuse the public into thinking it was Life Alert or was associated with Life Alert for Connect America's business advantage. As Life Alert itself alleged in the 2013 Action Complaint, Plaintiffs actions represented a continuous pattern of infringement and deception effected by various means common to all of the underlying actions by Life Alert – *i.e.,* by phone, via the internet, and through written correspondence. Moreover, the undisputed facts show that:

> ➢ the same plaintiff (Life Alert) raised nearly identical allegations against the same defendants (Connect America and Kenneth Gross) for infringing and diluting its trademarks, both through their own actions and through the assistance of surrogates and third parties;

> ➢ the same trademarks placed at issue by Life Alert in 2004 were again at issue in 2009;

> ➢ the same trademarks placed at issue by Life Alert in 2009 were again at issue in 2013; and

> ➢ the same deceptive statements by Connect America concerning when it was formed, how long it existed, and its status in the industry, were a central part of the allegations placed at issue by Life Alert in 2009 and 2013.

Based on these undisputed facts, as more fully set forth in Arch's Statement of Undisputed Facts (cited and discussed below in greater detail), the allegations against Plaintiffs of trademark infringement and the derivative claims stemming from those allegations, do not qualify for coverage under the Arch Policy. For the reasons that follow, Arch is entitled to summary judgment as a matter of law.

## III.    ARGUMENT

Arch has denied coverage for Plaintiffs' insurance demand pursuant to several provisions and exclusions in the Policy. [SOF ¶¶ 6-20, 154-56, 164-68, 173-81, 198-203.] In its motion for summary judgment, Arch seeks the Court's ruling on four grounds[3] – namely that:

> ➢ Life Alert's **Claim** for coverage was not first made during the **Policy Period.** Indeed, the allegations in a 2009 lawsuit that Plaintiffs Connect America and Mr. Gross violated the exact same trademarks for the same purposes and falsely advertised that Connect America was Life Alert in the same or similar manner, establishes a "common nexus" with the **Wrongful Acts** alleged in the 2013 Action, thus baring coverage pursuant to the Policy's **Interrelated Claims** provision and Prior Acts exclusion. Indeed, the allegations of infringement and deception by Life Alert against Connect America date back to a 2004 Cease and Desist letter issued by Life Alert involving  trademarks also placed at issue in the later actions.

> ➢ No coverage is available to Plaintiff Kenneth Gross in the first instance since he has not incurred nor sought coverage for "**Non-Indemnifiable Loss**" under Insuring Grant A, which is the only coverage grant available for individuals under the Policy.

> ➢ The Policy's "Trademark Exclusion" bars coverage for the Plaintiff Connect America Entities. And

> ➢ Plaintiffs' prior knowledge of **Wrongful Acts** and **Interrelated Wrongful Acts** alleging trademark infringement, unfair competition, false advertising and Lanham Act violations bars coverage under the Policy and as a matter of Pennsylvania law.

---

[3] Arch preserves all other coverage defenses for proof at trial and its focus on the above-identified coverage defenses in this motion is not intended to waive any other available coverage defense under the Policy, in equity, and/or at law.

**A.      Summary Judgment Legal Standard**

A party is entitled to summary judgment when it shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Where the moving party has the burden of proof at trial, it must show that, on all of the essential elements of its case, no reasonable jury could find for the non-moving party.  *In re Bressman*, 327 F.3d 229, 237-38 (3d Cir. 2003).  Where the non-moving party bears the burden of proof at trial, the moving party is entitled to summary judgment when it shows that the non-moving party cannot establish one essential element of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In response, the non-moving party must set forth specific facts showing there is a genuine issue for trial.  Fed R. Civ. P. 56(c)(1).

A dispute is only genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment."  *U.S. ex rel. Thomas v. Siemens AG*, 991 F. Supp. 2d 540, 566 (E.D. Pa. 2014) (Savage, J.), *aff'd*, 593 F. App'x 139 (3d Cir. 2014).  "Thus, where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Id.* (internal quotations and citations omitted).

**B.      Under Pennsylvania Law, Language in an Insurance Policy Must be Interpreted According to its "Natural, Plain and Ordinary" Meaning**

Under Pennsylvania law, insurance contracts are read as a whole and are to be interpreted according to their plain and ordinary meaning.  *See OneBeacon Am. Ins. Co. v. Urban Outfitters, Inc.*, 21 F. Supp. 3d 426, 436 (E.D. Pa. 2014) ("[T]he Pennsylvania Superior Court teaches that 'when interpreting the language of an insurance policy, the words must be construed in their natural, plain and ordinary sense.'") (quoting *Tyler v. Motorists Mut. Ins. Co.,* 779 A.2d 528, 531

(Pa. Super. Ct. 2001)); *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 163 (3d Cir. 2011) ("The goal of interpreting an insurance policy, like that of interpreting any other contract, is to determine the intent of the parties. It begins with the language of the policy. A policy must be read as a whole and its meaning construed according to its plain language."). Moreover, the Pennsylvania Superior Court in *Tyler, supra,* observed that, while an ambiguity in an insurance policy is construed against the insurer:

> a court must not 'distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity.' Instead, we must determine whether an ambiguity exists based upon the particular set of facts presented. And, simply because the parties do not agree on the proper construction to be given a particular policy provision does not render the contract ambiguous. Courts should read policy provisions to avoid an ambiguity if possible.

*Tyler,* 779 A.2d at 531 (quotations and citations omitted). *Accord Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 419 (3d Cir. 2011); *Meyer*, 648 F.3d at 164.

In any event, the Plaintiffs have affirmatively pled that the Policy is unambiguous. [SOF ¶ 212.] Therefore, as a matter of law, the Court should construe the intent of the Policy pursuant to its plain and unambiguous language.

**C.    There is No Coverage Under the Arch Policy for the 2013 Action Because it is Not a Claim First Made During the Policy Period and is Barred Under the Interrelated Claims Provision and Prior Acts Exclusion**

        1.    *The Interrelated Claims Provision and the Prior Acts Exclusion*

There is no coverage available to Plaintiffs for the 2013 Action under the Policy's **Interrelated Claims** Provision and Prior Acts Exclusion. Those respective provisions, and their pertinent definitions set forth below, provide as follows:

<u>**Interrelated Claims Provision**</u>

… all **Claims** arising from, based upon, or attributable to the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** first made on the earliest date that:

A.   any of such **Claims** was first made, even if such date is before the **Policy Period**;

B.   proper notice of such **Wrongful Act** or **Interrelated Wrongful Act** was given to the **Insurer** pursuant to Section 9.B above; or

C.   notice of such **Wrongful Act** or **Interrelated Wrongful Act** was given under any prior insurance policy.

[SOF ¶ 17.]

## **Prior Acts Exclusion**

… it is agreed that the Insurer shall not pay **Loss** for any **Claim** against an **Insured** arising from, based upon, or attributable to:

1.   any **Wrongful Act** occurring on or prior to the Prior Wrongful Acts Date specified below [12/24/10]; or

2.   any **Interrelated Wrongful Acts** thereto.

Prior Wrongful Acts Date: 12/24/10

[SOF ¶ 19.]

## **Definitions of "Wrongful Acts" and "Interrelated Wrongful Acts"**

The Policy defines the terms **Wrongful Acts** and **Interrelated Wrongful Acts** as follows:

"**Wrongful Act**" means any actual or alleged:

1.   act, error, omission, misstatement, misleading statement, neglect or breach of duty by Insured Persons in their capacity as such or in an Outside Capacity or, with respect to Insuring Agreement C, by any Insured Organization; or

2.   matter claimed against an Insured Person by reason of their serving in such capacity including in an Outside Capacity.

\*     \*     \*

"**Interrelated Wrongful Acts**" means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

[SOF ¶ 18.]

Thus, the **Interrelated Claims** Provision deems "**Claims** arising from, based upon, or attributable to the same **Wrongful Act** or **Interrelated Wrongful Acts**" to have occurred prior to the Policy Period -- thereby rendering unsatisfied the Insuring Agreement requirement of a "**Claim** first made … during the **Policy Period**."[4] [SOF ¶¶ 9, 13.] Similarly, the Prior Acts Exclusion bars coverage for "any **Claim** … arising from, based upon, or attributable to … any **Wrongful Act** occurring … prior to [December 24, 2010] … *or any Interrelated Wrongful Acts thereto*." [SOF ¶ 19 (emphasis added).]

<blockquote>

2.     *Courts Interpret "Interrelated Wrongful Acts" Broadly and in the Context of the Facts and Claim Actually Before the Court*

</blockquote>

As noted, the Policy defines "**Interrelated Wrongful Acts**" as "**Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes." [SOF ¶ 18.] Courts take a broad view of what constitutes a "common nexus [of] any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes." *See, e.g.*, *W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co.*, No. GJH-14-00425, 2014 WL 5812316, at *7 (D. Md. Nov. 7, 2014) (characterizing substantially similar "Interrelated Wrongful Acts" definition as an "expansive definition" and noting that "the relevant focus is not on any number of *differences* between [two lawsuits];

---

[4] Under Pennsylvania law, the requirement in a claims-made policy such as the Arch Policy that a claim be "first made" within the policy period is strictly construed, and requires no showing of prejudice. *See, e.g., 4th St. Investments, LLC v. Dowdell*, 340 F. App'x 99, 100 (3d Cir. 2009) (noting under Pennsylvania law that "claims-made policies are strictly construed and enforced"); *Westport Ins. Corp. v. Mirsky*, No. CIV.A. 00-4367, 2002 WL 31018554, at *10 (E.D. Pa. Sept. 10, 2002) ("Since the reporting requirement in a claims made policy helps define the scope of coverage under the policy, such reporting requirements are strictly construed.") (internal quotations omitted), *aff'd*, 84 F. App'x 199 (3d Cir. 2003). Thus, Plaintiffs must establish that their **Claim** – and any **Interrelated Claims** – fall within the **Policy Period**. As set forth in this brief, the undisputed facts simply do not support Plaintiffs' claim. *See, e.g., Buckley*, 744 A.2d at 309 (Pa. Super. Ct. 1999) ("Fundamental principles of insurance law make clear that, as a necessary prerequisite to recovery upon an insurance policy, the insured must show that a claim is within the coverage provided by the policy.") (citing *Miller v. Boston Ins. Co.*, 218 A.2d 275, 277 (Pa. 1966)).

instead, the relevant focus is on the *similarities* between the two") (emphasis by the court);

*Zodiac Grp., Inc. v. Axis Surplus Ins. Co.*, 542 F. App'x 844, 849 (11th Cir. 2013) (broadly

construing similar relatedness language that "treats all wrongful acts 'related by common facts,

circumstances, transactions, events and/or decisions ... as one Wrongful Act'"); *Seneca Ins. Co.*

*v. Kemper Ins. Co.*, 133 Fed. App'x. 770, 772 (2d Cir. 2005) (affirming "that there was a

sufficient factual nexus between two claims because the claims were 'neither factually nor

legally distinct' and arose from 'numerous logically connected facts and circumstances'");

*Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258 (11th Cir. 2000) (holding cases brought by different

plaintiffs were nevertheless "'related' in any common sense understanding of the word");

*Zunenshine v. Executive Risk Indem. Inc.*, 97 Civ. 5525, 1998 U.S. Dist. LEXIS 12699, at *11-12

(S.D.N.Y. Aug. 17, 1998) (taking a broad view of what entails a "common nexus [of] fact,

circumstance, situation, event, transaction or series of facts …"); *see also Szaferman, Lakind,*

*Blumstein & Blader PC v. Westport Ins. Corp.*, 518 F. App'x 107, 107-08 (3d Cir. 2013) (noting

"the language of the Interrelated Wrongful Acts provision" is held to be unambiguous under

New Jersey law).

   Often, but to no avail, insureds attempt to manufacture ambiguities in interrelatedness

language by advancing "slippery-slope" arguments based on the breadth of such language, but

courts have consistently emphasized the importance of a context-specific, fact-driven analysis

based on the circumstances and facts actually before the court, which also comports with

insurance policy interpretive principles under Pennsylvania law.  *See Highwoods Props., Inc. v.*

*Executive Risk Indem.*, 407 F.3d 917, 925 (8th Cir. 2005) (rejecting the insured's argument that

the term "'related' is indeterminate and could be used to connect any two claims" and

emphasizing the importance of a fact-driven, "contextualized approach" to relatedness *under the*

*specific circumstances and facts of the case*, and thus rejecting the insured's argument that

relatedness language is *per se* ambiguous due to its expansive nature); *Bay Cities Paving &*

*Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 855 P.2d 1263, 1274 (Cal. 1993) (substantially same);

*Gregory v. Home Ins. Co.*, 876 F.2d 602, 606 (7th Cir. 1989) ("[T]he word 'related' covers a

very broad range of connections" and applies if "the facts of th[e] case … comfortably fit within

the commonly accepted definition of the concept"); *see also Tyler v. Motorists Mut. Ins. Co.,* 779

A.2d 528, 531 (Pa. Super. Ct. 2001) ("[A] court must not distort the meaning of the [insurance

policy] language or resort to a strained contrivance in order to find an ambiguity. Instead, we

must determine whether an ambiguity exists based upon the particular set of facts presented.").

Here too, as in the above cases, the circumstances and facts of *this* case, fit comfortably into *this*

Policy language, for any number of reasons.  And, as noted, Plaintiffs pled that the Policy is

unambiguous.  [SOF ¶ 212.]

> 3.  *The 2013 Action Alleged Wrongful Acts That are Interrelated with the Wrongful Acts Alleged in the 2008/2009 Action and 2004 Cease and Desist Letter Such that there is No Coverage Available Under the Policy*

As set forth above, the Policy defines a "**Wrongful Act**" as *any* actual or alleged "act,

error, omission, misstatement, [or] misleading statement …" and it then defines "**Interrelated**

**Wrongful Acts**" as "**Wrongful Acts** that have as a common nexus *any* fact, circumstance,

situation, event, transaction, cause or series of causally connected facts, circumstances,

situations, events, transactions or causes."  [SOF ¶ 18.]  The key coverage question, therefore, is

whether *any* of actual or alleged **Wrongful Acts** at issue in the 2013 Action "have as a common

nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected

facts, circumstances, situations, events, transactions or causes" with *any* actual or alleged

**Wrongful Acts** at issue in the 2008/2009 Action and the 2004 Cease and Desist Letter issued by Life Alert. The answer to that question is a resounding *yes*.

> i. *The Allegations In The 2008/2009 Action and 2013 Action Share A Common Nexus Of Any Fact, Circumstance, Event, Transaction, Cause Or Series Of Causally Connected Facts, Circumstances, Events, Transactions Or Causes*

As the undisputed facts clearly show, the 2013 Action and 2008/2009 Action involved: (1) the same plaintiff, Life Alert, (2) suing the same defendants, Connect America and Gross, (3) under the same legal theories of trademark infringement and its derivative claims, (4) based on Connect America's and/or its dealers' alleged infringement of Life Alert's same "Life Alert" and "Help, I've Fallen and I Can't Get Up!" trademarks, (5) with related allegations of the same false advertising (*i.e.*, Connect America advertising that it existed longer than it actually did in order to create confusion that it was actually Life Alert), (6) all of which was for the same purpose – *as specifically alleged by Life Alert* – of creating confusion and deception in the personal emergency response system marketplace in order to "benefit unfairly from the valuable goodwill and excellent reputation established at great expense and effort throughout the United States by Life Alert through the use of the Life Alert Mark and/or the I've Fallen Marks." [*Compare* 2013 FAC (SOF ¶ 106) at ¶¶ 19-29, 104-05, *with* 2009 Action Complaint (SOF ¶ 36) at ¶¶ 8-16, 18-19; *see also* SOF ¶¶ 40-42, 61-64, 66-69, 75-76, 107-110, 116-119, 129-131.]

The following chart summarizes just some "facts, circumstances, situations, events, transactions or causes" that collectively establish the interrelatedness of the two lawsuits filed by Connect America:

| Alleged Wrongful Acts | 2009 Action | 2013 Action |
|---|:---:|:---:|
| Trademark infringement action brought by Life Alert against Connect America, Gross, and others. | ✓ | ✓ |
| First sentence of the complaint characterizes it as "a civil action for trademark infringement and dilution, false designation of origin, and unfair competition arising under the Lanham Act …." | ✓ | ✓ |
| Life Alert's same six "Life Alert Marks" and "I've Fallen Marks" at issue and form the basis for the alleged trademark infringement. | ✓ | ✓ |
| Claims of trademark infringement (and derivative claims) as well as false advertising involving the telephone, internet, and correspondence, as well as the actions of Connect America and/or third-party dealers on its behalf. | ✓ | ✓ |
| Alleges use of Life Alert's trademarks by Connect America, or dealers on its behalf, caused confusion, mistake, and/or deception as to origin or affiliation between Life Alert and Connect America. | ✓ | ✓ |
| Alleges the "purpose in utilizing the Life Alert Marks and/or the I've Fallen Marks is an attempt to benefit unfairly from the valuable goodwill and excellent reputation established at great expense and effort throughout the United States by Life Alert through the use of the Life Alert  Marks and/or the I've Fallen Marks." | ✓ | ✓ |
| Asserts a claim for false advertising under the Lanham Act (15 U.S.C. § 1125(a)) based on Connect America representing it was established decades longer than it actually had been in order to cause confusion, mistake and to deceive consumers into thinking Connect America was actually Life Alert or that it had more experience than it actually did. | ✓ | ✓ |
| Sought preliminary and permanent injunctive relief enjoining Connect America from infringing or diluting the same "Life Alert Marks" and "I've Fallen Marks", or using any false designation of origin or description, to lead the public to believe that any product or service manufactured, distributed, sold, offered for sale, or advertised by Connect America, or its dealers, was in any manner associated, connected, sold, manufactured, licensed, sponsored, approved or authorized by Life Alert. | ✓ | ✓ |

In response to this overwhelming common nexus of facts and circumstances, Connect America has taken the following positions:

*First*, Connect America argues that the 2013 Action and 2008/2009 Action cannot form the basis for the application of the **Interrelated Claims** Provision and Prior Acts Exclusion because the allegations in the 2013 Action purportedly involved "robo-calling" whereas the

allegations in the 2008/2009 Action purportedly involved internet advertising and calls to a "1-800" number.  [Plaintiffs' Complaint (SOF ¶ 1) at ¶¶ 46-50; Plaintiffs' Answer to Arch's Counterclaim (SOF ¶ 214), at ¶¶ 37, 79; Plaintiffs' Answers to Arch's Interrogatories (SOF ¶ 16), at ¶ 14.]

*Second*, Connect America argues that the 2008/2009 Action "only pertained to supposed violations of Life Alert's alleged trademarks phrases through internet postings, whereas the 2013 [FAC] alleged false statements as to Connect America's length of time in business and experience[.]"  [Plaintiffs' Complaint (SOF ¶ 1) at ¶ 50(a).]

*Third*, Connect America argues that the 2013 Action "did not allege a violation" of the 2009 Permanent Injunction, which according to Connect America shows a purported lack of relatedness.  [Plaintiffs' Complaint (SOF ¶ 1) at ¶ 50(d); Plaintiffs' Answer to Arch's Counterclaim (SOF ¶ 214), at ¶¶ 37, 79.]

Each of Connect America's positions is without merit and is addressed in turn below.

> ii.     *Plaintiffs' Argument that the Allegations in the 2013 Action Do Not Share a "Common Nexus" with the Allegations in the 2008/2009 Action Because the Method of Infringement was not Identical Finds No Support in the Policy Language Or Case Law*

As courts recognize, by definition, Interrelated Wrongful Acts provisions do not require *identical* lawsuits, claims, or wrongful acts.  Rather, under the Policy language, what is required is a "*common nexus* [of] *any* fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes."  [SOF ¶ 18.] *See W.C. & A.N. Miller*, 2014 WL 5812316, at *7 (noting "the relevant focus is not on any number of *differences* between the 2006 Adversary Proceeding and the 2010 Lawsuit; instead, the relevant focus is on the *similarities* between the two.  Indeed, so long as even a single fact,

circumstance, situation, transaction, or event logically or causally connects the 2006 Adversary

Proceeding and 2010 Lawsuit, then they would be 'Interrelated Wrongful Acts.'")

Connect America's assertion that the 2013 Action alleged a new or different *manner* of

infringement involving "robo-calling" ignores the dominant common fact that such conduct was

– like the conduct alleged in the 2008/2009 Action – aimed at misleading the same consumers in

the personal emergency response system marketplace into believing Connect America was, or

was affiliated with, the same "Help, I've Fallen and I Can't Get Up!" company, *i.e.*, Life Alert.

In fact, in its March 7, 2013 Cease and Desist Letter to Connect America, sent shortly before

Life Alert filed the 2013 Action, Life Alert alleged that exactly such conduct "clearly constitutes

(among other things) a violation of the [2009] Final Judgment and Permanent Injunction by the

fraudulent use of Life Alert's trademark 'I've Fallen And I Can't Get Up'." [SOF ¶ 92.] Even

Mr. Gross admitted that the conduct enjoined in 2009 and referenced in the 2013 Cease and

Desist Letter was placed at issue in the 2013 Action, testifying:

> Q. [The Permanent Injunction] says that you're permanently enjoined and
> prohibited from using the trademarks "Life Alert," "Help, I've fallen and I
> can't get up," and "I've fallen and I can't get up," or any trademark or name
> confusingly similar thereto, correct?"
>
> A, Correct, and we never used them again.
>
> Q. You're aware that Life Alert contended in the 2013 litigation that you or
> your agents did use those trademarks and that that was at least part of the
> reason that they sued you in 2013?
>
> A. That's what they allege.

[SOF ¶ 95.]

Still, in Connect America's (incorrect) view, so long as its alleged infringement, of the

same Life Alert trademarks, for the same purpose (as expressly alleged by Life Alert), expanded

to include calls *to* consumers (as opposed to the alleged inquiries *from* customers to Connect

America's "1-800 telephone number," in the 2008/2009 Action), that somehow render the "facts, circumstances, situations, [or] events" of Connect America's alleged infringement in the 2013 Action unrelated to the "facts, circumstances, situations, [or] events" of Connect America's prior infringement. But whether Connect America was alleged to have infringed through internet advertising and calls to a "1-800" number (as in the 2008/2009 Action) [SOF ¶ 44] versus representing itself in telephone calls to consumers to be the "Help, I've Fallen and I Can't Get Up!" company (as in the 2013 Action [SOF ¶¶ 90, 95, 99, 118-19]), the "fact, circumstance, situation, [or] event" of Connect America allegedly infringing on Life Alert's same trademarks (as well as falsely advertising it had been established longer than it had been and was the "ORIGINAL" medical alert company) in order to capitalize on the goodwill and reputation of Life Alert remained consistent, as Life Alert expressly alleged. [SOF ¶¶ 67-76, 113-16, 119, 122-23, 128-31]

Further, while wholly unnecessary to establish interrelatedness, both actions *did* involve alleged infringement by phone, internet and in writing. Indeed, the 2013 FAC makes clear that the allegations of trademark infringement, false advertising and/or false designation of origin by Plaintiffs included multiple modes and methods by Plaintiffs, such as:

> ➢ "Bidding on and/or purchasing Life Alert's trademarks for Google's pay-per-click advertising through the use of parked domains" (2013 FAC (SOF ¶ 106) at ¶ 39(a));

> ➢ "Use by Connect America's dealer, Medical Guardian, LLC, of Life Alert's trademarks in blogs that were part of Connect America's advertising campaign" (*id.* at ¶ 39(b));

> ➢ "Using Life Alert's trademarks on its web page regarding Connect America affiliates on the pretext that it was advising its affiliates not to use Life Alert's trademarks" (*id.* at ¶ 39(c));

> ➢ "Hiring salespersons using advertisements that referenced Life Alert's Marks" (*id.* at ¶ 64(b));

- Providing "salespersons with telemarketing scripts that referenced Life Alert's [Marks]" (*id.* ¶ 64(c)); and

- Employing salespersons who used Life Alert's Marks (*id.* at ¶ 64(d)).

These allegations demonstrate that Plaintiffs were accused of infringing the Life Alert Marks through search engine optimization techniques, through phone solicitations and by other means. It simply is not the case that the wrongful activity alleged in the 2013 FAC relates only to the "phone scam" and "false claims" that Connect America had been in business for 30 years.

Similarly, Connect America's characterization of the 2008/2009 Action as only involving internet activity is also an incorrect oversimplification. As Connect America's financial expert in the 2008/2009 Action, David Nolte, explained in his May 1, 2009 expert report, *"[r]egardless of the customer origin, all customer order are placed via telephone*." [SOF ¶ 71.] Indeed, at his deposition in this coverage action, Mr. Leighton confirmed that Mr. Nolte's statement was correct, testifying: "Yeah, to finalize an order you have to then speak with somebody by phone." [SOF ¶ 72.] And, as disclosed at Mr. Gross's deposition in the 2008/2009 Action, those phone discussions occasioned the use of a sales script that contained alleged misrepresentations by Connect America over the phone regarding when it originated ("1977") and its status in the industry ("the original medical alarm company") – which are precisely at issue in the 2013 Action as well. [SOF ¶¶ 66-74.]

Simply stated, there are an overwhelming number of "facts, circumstances, situations, [or] events" that connect the allegations in the 2013 Action to the allegations in the 2008/2009 Action. Life Alert specifically alleged in both actions the same singular goal to be accomplished through Connect America's alleged infringement and false statements – *i.e.*, to create confusion and deception in order to "benefit unfairly from the valuable goodwill and excellent reputation established at great expense and effort throughout the United States by Life Alert through the use

of the Life Alert Mark and/or the I've Fallen Marks." [*Compare* 2013 FAC (SOF ¶ 106) at ¶¶ 104-05, *with* 2009 Action Complaint (SOF ¶ 36) at ¶¶ 18-19.] This, in itself, has proven persuasive to many courts when assessing interrelatedness under a common nexus of fact. For example, in *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258 (11th Cir. 2000), the Eleventh Circuit unanimously affirmed the following reasoning from the district court with respect to its holding of relatedness:

> It is clear that Hall's course of conduct encouraged investment in the K.D. Trinh's notes. *Though clearly this course of conduct involved different types of acts, these acts were tied together because all were aimed at a single particular goal.* The fact that these acts resulted in a number of different harms to different persons, who may have different types of causes of action against Hall does not render the "wrongful acts" themselves to be "unrelated" for the purposes of the insurance contract. Rather, they comprised a single course of conduct designed to promote investment in K.D. Trinh. It is this same course of conduct which serves as the basis for both the *Cowan* and *Wendt* litigation. *The conduct at issue in both cases was arguably the "same" and at the very least "related" in any common sense understanding of the word.*

*Id.* at 1264 (emphasis added); *see also Highwoods Props., Inc. v. Exec. Risk Indem., Inc.*, 407 F.3d at 924-925 (8th Cir. 2005) (holding a later lawsuit was related to an earlier one even though they "did not arise out of identical facts" and different remedies were sought in the earlier and later suits, and even though the later suit added "a number of facts that had occurred since [the earlier suit] was filed"); *W.C. & A.N. Miller*, No. GJH-14-00425, 2014 WL 5812316 at *5 (rejecting the insured's argument that what the insurer had characterized as a "common scheme" was actually just a "common motive" that the insured claimed was insufficient to establish relatedness).

If there were no relationship or connection between the allegations and claims in the 2013 Action and those in the 2008/2009 Action, as Plaintiffs contend, then:

> ➢ Why would Life Alert feel the need to plead, in great detail, "Connect America's History of Infringing Life Alert's Trademarks" in the 2013 Action, including

discussing the 2004 Cease and Desist Letter and the 2008/2009 Action?  (SOF ¶ 106, 2013 FAC ¶¶ 30-40.)

➢ Why would Life Alert plead in ¶ 40 of the 2013 FAC that "after the resolution of the [2008/2009 Action] … when confronted with Connect America's *continuing infringement* of Life Alert's trademarks, in each instance, Gross disingenuously claimed they were mistakes on the part of his company or one of his dealers"? (emphasis added.)

➢ Why would Life Alert have sent its March 7, 2013 Cease and Desist Letter to Connect America shortly before filing the 2013 Action putting Connect America "on notice of its violations of the … [2009] Permanent Injunction … by the fraudulent use of Life Alert's trademark 'I've Fallen and I Can't Get Up'" in connection with "sales persons who call potential customers for emergency response systems and falsely state that they work with the 'I've Fallen and Can't Get Up' company, *i.e.*, Life Alert."  [SOF ¶¶ 88-102.]

➢ Why would Connect America never challenge First Mercury's coverage denial based on First Mercury's conclusion that the 2013 Action was for "trademark infringement" and that "Connect America submitted a claim for nearly identical charges of trademark infringement brought by the same plaintiff, Life Alert, in 2008." [SOF ¶¶ 189-91.]

*     *     *

Clearly, Life Alert saw fit to link the 2013 Action allegations and claims with the 2008/2009 Action allegations and claims within the text of the 2013 FAC.  But even if Life Alert had not specifically pled "Connect America's History of Infringing Life Alert's Trademarks" or argued in hindsight some intent contrary to its contemporaneous filings and correspondence, the common nexus between the "facts, circumstances, situations, [or] events" in the actions is clear and for the Court to determine.  Plaintiffs' position that the allegations and claims in the 2008/2009 Action and 2013 Action – including the mode of infringement – must be *identical* simply finds no support in either the Policy or the case law, and this Court should reject Plaintiffs' suggested contortion of Policy language that applies squarely to the facts and circumstances of this case.

iii.     *Plaintiffs' Allegation in its Complaint that the 2008/2009 Action Did Not Involve a False Advertising Claim Based on Connect America Falsely Advertising its Length of Time in Business is Incorrect and Would Not Defeat Interrelatedness In Any Event*

In their Complaint in this coverage action, Plaintiffs' alleged that the 2008/2009 Action "only pertained to supposed violations of Life Alert's alleged trademarks phrases, through internet postings, whereas the 2013 [FAC] alleged false statements as to Connect America's length of time in business and experience[.]" [SOF ¶ 65.] Plaintiffs are incorrect.

Connect America's 2008/2009 Action Rule 26(a) Initial Disclosures identified Mr. Gross as a witness likely to have information regarding "Connect America's actions that it took concerning its understanding of the facts which gave rise to Life Alert's allegations, *Connect America's call centers, and the protocol for call operators*." [SOF ¶ 66.] The 2009 Complaint alleged that "Defendants' acts as alleged above, as well as others, also constitute false advertising in violation of the Lanham Act … 15 U.S.C. § 1125(a)…." [2009 Action Complaint (SOF ¶ 36) at ¶ 26.] Life Alert's counsel questioned Mr. Gross at his 2008 Action deposition about a Connect America telephone sales script, which Mr. Gross then authenticated as the then-current protocol for Connect America's telephone sales, and one that "was implemented from day one." [SOF ¶¶ 67-68.] The sales script states, in pertinent part: "*We are the original medical alarm co. We've been here since 1977 .. in fact we just had our 31st year anniversary.*" [SOF ¶¶ 69-70.] These are the same false advertising allegations alleged in the 2013 FAC. [*See* 2013 FAC (SOF ¶ 106) at ¶ 43, alleging Connect America's false advertising that it was "The ORIGINAL Medical Alert Company" and that it had been established "since 1977"), and *id.* at ¶ 44 ("We have been providing peace of mind since 1977 – over 35 years").]

In case that were not enough, a Proposed Final Pre-Trial Conference Order from the 2009 Action set forth the elements of a Lanham Act (15 U.S.C. § 1125(a)) false advertising claim (*i.e.*,

the same Lanham Act section under which the 2013 FAC pleads false advertising) and lists under the heading "Issues Plaintiff [Life Alert] Contends Remain to Be Tried" the following: "*Did Defendants ... violate 15 U.S.C. § 1125(a) of the Lanham Act by ... represent[ing] that Connect America was established in 1977.*" [SOF ¶¶ 73-74.]

Accordingly, Plaintiffs' claims in its pleadings in this case that the 2008/2009 Action lacked a similar false advertising claim to the 2013 Action are simply wrong. In fact, the 2008/2009 Action raised the same allegations of misleading statements by Connect America – *i.e.,* that it was founded in 1977; was the "original medical alarm co."; and had over 30 years in business – as set forth in the 2013 FAC. Indeed, this symmetry establishes *yet another* basis for the Court to find a "common nexus [of] any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes."

       iv.       *Connect America's Allegation in its Complaint that Life Alert "Did Not Allege a Violation of the [2009] Permanent Injunction" is (1) Incorrect and (2) Has No Impact Regarding Interrelatedness*

In their pleadings in this coverage action, Plaintiffs' alleged that the 2013 Action "did not allege a violation" of the 2009 Permanent Injunction. [Plaintiffs' Complaint (SOF ¶ 1) at ¶ 50(d); Plaintiffs' Answer to Arch's Counterclaim (SOF ¶ 214), at ¶¶ 37, 79.] However, Life Alert sent the 2013 Cease and Desist Letter just two months prior to filing the 2013 Action, and in that letter Life Alert advised that it was "writing to [ ] put ConnectAmerica.com, LLC … on notice of its violations of the [2009] Final Judgment and Permanent Injunction … pursuant to Paragraph 5 of the Final Judgment and Permanent Injunction."[5] [SOF ¶¶ 88-99.]

---

[5] Connect America neither disclosed the existence of, nor provided Arch with, the 2013 Cease and Desist Letter until it was produced in this action. [SOF ¶ 89.]

In the 2013 Cease and Desist Letter, Life Alert asserted that "Connect America, in collaboration with another emergency response company named Life Watch, Inc., has been employing sales persons who call potential customers for emergency response systems and falsely state that they work with the "I've Fallen and Can't Get Up" company, *i.e.*, Life Alert." [SOF ¶ 90.] The 2013 Cease and Desist Letter further advised Connect America that its conduct "constitutes (among other things) a violation of the Final Judgment and Permanent Injunction by the fraudulent use of Life Alert's trademark 'I've Fallen and I Can't Get Up'." [SOF ¶ 92.] Both Mr. Gross and Mark Leighton, Connect America's CEO throughout the filing and resolution of the 2013 Action, understood that the 2013 Cease and Desist Letter alleged that Connect America was infringing on Life Alert's trademarks. [SOF ¶¶ 94-95.] Thus, Plaintiffs' contention that Life Alert "did not allege a violation" of the 2009 Permanent Injunction is simply incorrect, as shown above.

Moreover, Life Alert *did* request a permanent injunction in the 2013 Action to prevent Plaintiffs from infringing on the *same* trademarks at issue in 2009. [*See* 2013 FAC (SOF ¶¶ 106, 133) at WHEREFORE Clause ¶ 3.] In fact, the injunctive relief sought in the 2013 FAC is *virtually identical* to the injunctive relief sough in the 2009 Complaint. [*See id.; compare* 2009 Complaint (SOF ¶43) at INJUNNCTIVE RELIEF p.9.)] [6] Life Alert's tactical decision to proceed with filing the 2013 Action as opposed to seeking to enforce the 2009 Permanent Injunction alone (which, by its plain terms, does not provide for money damages) does not, as Connect America suggests, prove that the allegations and claims in the 2013 Action were not related to the 2009 Permanent Injunction, thereby purportedly differentiating those allegations and claims from the prior ones.

---

[6] The only difference is the inclusion of one additional trademark ("LIFE ALERT YOU ARE NEVER ALONE 24/7") and a single additional sub-paragraph in the 2013 FAC.

Although enforcement of the 2009 Permanent Injunction by itself certainly was one option Life Alert had, another was to proceed as it did here with its trademark infringement and derivative claims, and to seek – in addition to the nearly identical injunctive relief requested – the corresponding potential money damages available (remedies not available under the 2009 Permanent Injunction), including treble damages and attorneys' fees, which Life Alert indeed sought in the 2013 Action, amongst other relief.  [SOF ¶¶ 85-86.]

As shown by Life Alert's unequivocal assertion in the 2013 Cease and Desist Letter, Life Alert itself recognized Connect America's conduct "constitute[d] (among other things) a violation of the Final Judgment and Permanent Injunction by the fraudulent use of Life Alert's trademark 'I've Fallen and I Can't Get Up'."  [SOF ¶ 92.]  Moreover, Mr. Gross' deposition testimony that the 2013 Action alleged Connect America's infringement of the same trademarks proscribed from use in the 2009 Permanent Injunction shows Plaintiffs' own understanding that the prohibited conduct addressed in 2009 was alleged yet again in 2013.  [SOF ¶ 95.]  Whatever its reasons – whether they be the financial gain available in a new action or the inclusion of additional co-defendants in the 2013 Action – Life Alert's reasoning  for filing a new complaint seeking disgorgement of profits and injunctive relief for the violation of the same trademarks and same alleged false advertising has no relevance as to the existence of a common nexus of facts, circumstances and events between the two lawsuits.

Based on the undisputed facts, Plaintiffs **Claim** for coverage for the 2013 Action relates to **Interrelated Wrongful Acts** which predate the Policy Period.  The **Claim** is thus deemed made prior to the inception of the Policy.  As such, coverage is unavailable for the 2013 Action pursuant to the Policy's **Interrelated Claims** Provision.  Likewise, since the **Wrongful Acts** and

**Interrelated Wrongful Acts** occurred before December 2010, coverage is also barred by the Policy's Prior Acts Exclusion as a matter of law.

        4.      *The Allegations In The 2004 Cease And Desist Letter And 2013 Action Share A Common Nexus Of Any Fact, Circumstance, Event, Transaction, Cause Or Series Of Causally Connected Facts, Circumstances, Events, Transactions Or Causes.*

For substantially the same reasons discussed above, the 2004 Cease and Desist Letter also shares "a common nexus of any fact, circumstance, event, transaction, cause or series of causally connected facts, circumstances, events, transactions or causes" with the 2013 Action. [SOF ¶¶ 21-30.] The 2004 Cease and Desist Letter defines the term "Marks" to include the term LIFE ALERT and the phrase "Help, I've Fallen and I Can't Get Up!" [SOF ¶ 24.] The Letter goes on to say that "We are in receipt of documentation indicating that you are promoting, advertising, distributing and/or selling medical alert systems ('Product') on the website 'MedicalAlarm.com' by using the Marks in your company's advertising, in the metatags of your company's website and as part of a 'search term' for your company on the internet." It continues by saying that this use "constitutes, among other things, trademark infringement and/or dilution, as well as unfair competition under state and federal law." [SOF ¶ 25.]

Here, once again, Life Alert accused Connect America of misleading the public into thinking it was the "I've Fallen and Can't Get Up" company through infringing on the same core "Life Alert" and "I've Fallen Marks" and accusing Connect America of trademark infringement, dilution and unfair competition, as well as improper advertising, in the process (*i.e.*, the same allegations and claims present in the 2008/2009 Action and 2013 Action). [SOF ¶¶ 21-30.]

Therefore, under the plain language of the Policy's broad definition of **Interrelated Wrongful Acts,** the conduct alleged in the 2004 Cease and Desist Letter shares a "common nexus of any fact" with the same allegations made in 2013 in which Connect America is accused

of using the same Marks of the same competitor to attract potential customers through deception or confusion for the purpose of increasing its market share at the expense of Life Alert's share. As such, on this additional basis as well, Plaintiffs' **Claim** for coverage for the 2013 Action predates the **Policy Period** due to the **Interrelated Claims** Provision and Prior Acts Exclusion such that coverage is unavailable for the 2013 Action as a matter of law.[7]

### D. Plaintiff Kenneth Gross Has No Claim for "Non-Indemnifiable Loss" Under D&O Insuring Agreement A. "Insured Person Liability"

The following facts are undisputed and un-controvertible:

➢ Kenneth Gross did not pay any part of the $2.5 million payment owed under the 2013 Settlement Agreement. [SOF ¶¶ 137-38.]

➢ Kenneth Gross did not pay any part of the $2.5 million Escrow Agreement payment. [SOF ¶¶ 146-47.]

➢ Connect America paid the entire $2.5 million Settlement Agreement payment to Life Alert on January 31, 2014. [SOF ¶¶ 137-38.]

➢ Connect America paid the entire $2.5 million Escrow Agreement payment to Life Alert on or about February 27, 2015.[8] [SOF ¶¶ 146-47.]

➢ Kenneth Gross did not pay any **Defense Costs** in connection with the 2013 Action. [SOF ¶ 150.]

➢ Connect America paid all of Plaintiffs' collective **Defense Costs** for the 2013 Action. [SOF ¶ 150.]

---

[7] For the same reasons, coverage is also barred under the Policy's Prior and Pending Litigation Exclusion. [SOF ¶ 20].

[8] Moreover, the Escrow Agreement payment is not recoverable as "**Loss**" under the Policy. First, the Escrow Agreement did not contain a release of claims and constitutes a voluntary payment by Plaintiffs not the payment of any legal obligation. [SOF ¶ 139]. In fact, Plaintiffs are entitled to recoup up to the *entire* $2.5 million Escrow Agreement payment based on Life Alert's recovery from the other defendants in the 2013 Action. [SOF ¶ 148.] Life Alert just settled recently with another defendant in the 2013 Action, but Plaintiffs (and Life Alert) have so far refused to provide Arch with any information about that settlement, despite Arch's requests. [SOF ¶ 149.] Moreover, Plaintiffs never sought approval from Arch to make such a voluntary payment and Arch's consent is a condition-precedent under the Policy. [SOF ¶¶ 139-45.] Thus, the Escrow Payment is not covered **Loss** for Connect America or Mr. Gross and is otherwise excluded from coverage for the same reasons discussed in Arch's summary judgment motion, in any event.

➢ Mr. Gross was at all times fully indemnified for any settlement and **Defense Cost** payment by Connect America. [SOF ¶ 11-12, 138, 150.]

Despite these undisputed facts, Plaintiffs in this lawsuit purport to seek coverage for Kenneth Gross individually under the Policy's D&O Insuring Agreement A. [SOF ¶ 6.] Such coverage simply does not exist. That provision provides as follows:

A. Insured Person Liability

The Insurer shall pay **Non-Indemnifiable Loss** on behalf of the **Insured Persons** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insured Persons**.[9]

[SOF ¶ 9.]

Under the plain language of the Policy, Plaintiffs cannot possibly meet their burden under Pennsylvania law of proving any entitlement to coverage. *See Buckley v. Exodus Transit & Storage Corp.*, 744 A.2d 298, 309 (Pa. Super. Ct. 1999) ("Fundamental principles of insurance law make clear that, as a necessary prerequisite to recovery upon an insurance policy, the insured must show that a claim is within the coverage provided by the policy.") (citing *Miller v. Boston Ins. Co.*, 218 A.2d 275, 277 (Pa. 1966)); *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) (explaining that, under Pennsylvania law, "in insurance coverage disputes an insured bears the initial burden to make a prima facie showing that a claim falls within the policy's grant of coverage").

As Connect America paid the entirety of the Settlement Agreement payment, Escrow Agreement payment, and Plaintiffs' **Defense Costs**, Kenneth Gross has incurred no **Loss** at all.

---

[9] The Policy defines an **Insured Person** as any **Executive** or **Employee** and there is no dispute that Kenneth Gross qualifies as an **Insured Person** under the Policy. [SOF ¶ 7.] Likewise, there is no dispute that Connect America Holdings and Connect America qualify do not qualify as **Insured Persons** but, rather, qualify as **Insured Organizations** under the Policy. [SOF ¶ 8.]

[SOF ¶¶ 11-12, 137-38, 146-47, 150.] More specifically, nowhere in the Complaint or in any testimony or document produced in discovery have Plaintiffs alleged that Mr. Gross suffered **Non-Indemnifiable Loss**, defined in the Policy as "**Loss** incurred by **Insured Persons** that all **Insured Organizations** cannot indemnify because of legal prohibition or **Insolvency**." [SOF ¶ 10.] Quite the contrary. Kenneth Gross and Mark Leighton – Connect America's CEO throughout the filing and resolution of the 2013 Action and currently the President of Connect America – each testified that Connect America had fully indemnified Mr. Gross for the 2013 Action settlement and Defense Costs. [SOF ¶¶ 49, 137-38, 150.] Moreover, Connect America has never alleged that its contractual and common law indemnity obligations to Mr. Gross cannot be fulfilled because of legal prohibition or insolvency. [SOF ¶ 12.] Indeed, as noted, Connect America has made all settlement and defense payments to date; Mr. Gross has paid *nothing*. [SOF ¶¶ 11-12, 137-38, 146-47, 150.]

Accordingly, as there is no genuine issue of material fact, Arch is entitled to judgment as a matter of law that Plaintiffs cannot meet their burden of proving that Kenneth Gross is entitled to any coverage under D&O Insuring Agreement A for "Insured Person Liability."

      **E.**       **The Trademark Infringement Exclusion Bars Coverage for Connect America Holdings and Connect America Under Insuring Agreement B. "Organization Reimbursement" and Insuring Agreement C. "Organization Liability"**

           1.    *D&O Insuring Agreement B. "Organization Reimbursement" and D&O Insuring Agreement C. "Organization Liability"*

As "**Insured Organizations**" under the Policy, Connect America Holdings and Connect America seek coverage under Insuring Agreements B. "Organization Reimbursement" and C. "Organization Liability." [SOF ¶ 6, 8.] D&O Insuring Agreements B. and C. state as follows:

     B.   Organization Reimbursement

     The **Insurer** shall pay **Loss** on behalf of an **Insured Organization** that such **Insured Organization** has, to the extent permitted or required by law,

indemnified the **Insured Persons** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or Extended Reported Period, if applicable, for a **Wrongful Act** by the Insured Persons.

C.   Organization Liability

The **Insurer** shall pay **Loss** on behalf of an **Insured Organization** resulting from a **Claim** first made against such **Insured Organization** during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by an **Insured Organization**.

[SOF ¶ 13.]

Thus, if coverage were available under the Policy – and for the reasons explained below it is not – Insuring Agreement B. would provide for reimbursement to Connect America for any **Loss** Connect America indemnified an "Insured Person" (*i.e.*, Kenneth Gross), whereas Insuring Agreement C. would provide for indemnity to Connect America for Connect America's own liability (*i.e.*, aside from any indemnity Connect America paid to Kenneth Gross).[10]   However, even assuming *arguendo* that Plaintiffs could carry their burden of proving Insuring Agreements B. and/or C. are satisfied, coverage is barred, in full, for the Plaintiffs Connect America Holdings and Connect America pursuant to the Policy's Trademark Infringement Exclusion.

   2.   *The Trademark Infringement Exclusion Bars Coverage in Full for Connect America Holdings and Connect America*

The Policy's Trademark Infringement Exclusion states as follows:

The **Insurer** shall not pay **Loss** for any **Claim** against an **Insured Organization**:

arising from, based upon, or attributable to infringement of any intellectual property rights, including, without limitation, copyrights, patents, trademarks, trade names, trade dress, service marks, or trade secrets[.]

[SOF ¶ 15.]

---

[10]    Note that **Defense Costs** are included in the definition of **Loss** and are not a separate obligation under the Policy.  In fact, under Endorsement 19, the Policy explicitly provides that the Insured, not Arch, has the duty to defend **Claims**.  [SOF ¶ 14.]

Courts apply trademark exclusions according to their plain terms. *See Hammond v. U.S. Liab. Ins. Co.*, No. 14CV0847, 2015 WL 401503, at *12 (W.D. Pa. Jan. 28, 2015) (holding claim for "alleged misappropriation of trade secrets made in bad faith and/or copyright infringement" was barred by the policy's exclusion for 'loss, cost, or expense' arising out of any 'infringement of copyright, patent, trademark, trade secret or other intellectual property rights'"). Moreover, under Pennsylvania law, courts routinely construe "arising out of" language in an exclusion broadly. *See Forum Ins. Co. v. Allied Sec., Inc.*, 866 F.2d 80, 82 (3d Cir. 1989) (observing that the Pennsylvania Supreme Court holds "'arising out of' means causally connected with, not proximately caused by" and further that "'[b]ut for' causation, *i.e.*, a cause and result relationship, is enough to satisfy this provision of the policy") (quoting *McCabe v. Old Republic Ins. Co.*, 228 A.2d 901, 903 (Pa. 1967)); *Mega Const. Corp. v. Quincy Mut. Fire Ins. Co.*, 42 F. Supp. 3d 645, 656 (E.D. Pa. 2012) (stating that "courts applying Pennsylvania … law interpret the 'arising out of' language at issue here broadly to require either 'but-for' causation or a 'substantial nexus'").

Seemingly conceding that the Trademark Infringement Exclusion applies to the 2013 FAC's trademark infringement and derivative Lanham Act claims of unfair competition and false designation of origin, Plaintiffs solely contend that the exclusion should not apply to Life Alert's false advertising claim. [SOF ¶ 16.] Specifically, Life Alert alleged that Connect America falsely advertised that it was established in 1977 (as opposed to 2004, when it actually was established) and that it was the "ORIGINAL medical alarm company" [*see* 2013 FAC (SOF ¶ 106) at ¶¶ 41-53, 135-144] in order "to cause confusion and mistake and to deceive consumers into thinking Connect America is actually Life Alert or another competitor that has been in existence for many years." [*Id.* at ¶ 49.] Life Alert specifically pled in the 2013 FAC that

"Connect America's advertising of its products and services, as described above, violates Section 43(a) of the Lanham Act at 15 U.S.C. § 1125(a)." [*Id.* at ¶ 143.]

Plaintiffs would have this Court view the Lanham Act false advertising claim in a vacuum – ignoring that the false advertising claim "arises out of" or is "attributable to" Connect America's "infringement of *any* intellectual property rights, including, without limitation, copyrights, patents, trademarks, trade names, trade dress, service marks, or trade secrets," (emphasis added), per the Policy's broad Trademark Infringement Exclusion. Tellingly, Connect America does not even *attempt* to argue that the Lanham Act unfair competition and false designation of origin claims fall outside the Trademark Infringement Exclusion, and they do not.

The false advertising claim is bought under *the very same section of the Lanham Act* as the other derivative counts, and courts have rejected arguments from insureds that Lanham Act claims of unfair competition, false designation of origin, *and false advertising* are not barred by trademark infringement exclusions. *See, e.g., Superformance Int'l, Inc. v. Hartford Cas. Ins. Co.*, 332 F.3d 215, 223 (4th Cir. 2003) ("Even if these [Lanham Act] claims could arguably be characterized as claims for 'disparagement' and '*false advertising*' … they would still be properly excluded by the trademark exclusion.") (emphasis added); *Marvin J. Perry, Inc. v. Hartford Cas. Ins. Co.*, 412 F. App'x 607 (4th Cir. 2011) (holding trademark exclusion barred coverage for unfair competition claims because those claims "arose out of" allegations of trademark infringement); *Parameter Driven Software, Inc. v. Mass. Bay Ins. Co.*, 25 F.3d 332 (6th Cir. 1994) (substantially same); *Citizens Ins. Co. of Am. v. Uncommon, LLC*, 812 F. Supp. 2d 905, 910-12 (N.D. Ill. 2011) (holding trademark exclusion barred coverage for claims of unfair competition, deceptive trade practices, tortuous interference, and unjust enrichment because those claims "arose out of" the alleged trademark infringement).

For its false advertising claim, Life Alert pled that "Connect America's advertising of its products and services, as described above, violates Section 43(a) of the Lanham Act at 15 U.S.C. § 1125(a)." " [*see* 2013 FAC (SOF ¶ 106) at ¶ 143.] In *Superformance Int'l*, *supra*, the Fourth Circuit held that derivative Lanham Act claims were barred under a similarly worded and broad trademark infringement exclusion. Specifically, the court explained that "Section 43(a) of the Lanham Act prohibits similar [infringing] conduct with respect to unregistered marks" and "various sorts of trademark violations and related unfair competition based on those violations" that go directly to the "scope of the Lanham Act's purpose" of preventing fraud and deception in commerce. *Superformance Int'l*, 332 F.3d at 222-24. Accordingly, the court held that "complaints falling within the scope of the Lanham Act are precisely the type excluded from coverage" under the exclusion for claims "[a]rising out of the infringement of trademark, trade name, service mark or other designation of origin or authenticity." *Id.* at 222. Notably, the court explained that "[e]ven if these [derivative Lanham Act] claims could arguably be characterized as claims for … 'false advertising' … they would still be properly excluded by the trademark exclusion." *Id.* at 223.

Here, Life Alert alleged false advertising in violation of Section 43(a) of the Lanham Act at 15 U.S.C. § 1125(a), and there can be no question that the false advertising claim, as alleged by Life Alert, comes within the "scope of the Lanham Act's purpose" such that it is barred by the Policy's broad Trademark Infringement Exclusion. Furthermore, the 2013 FAC pleads a direct connection between the false advertising alleged and the trademark infringement alleged. For example, the Gross/Sirlin Letter (which Life Alert attached as Exhibit "I" to the 2013 FAC) that accompanied the medical alert systems ordered vis-à-vis the calls to consumers, falsely advertised that Connect America was established "since 1977." [SOF ¶¶ 96-99, 122-23.] In

other words, as alleged in the 2013 FAC, after a consumer was called by what purported to be the "Help, I've Fallen and I Can't Get Up!" company, the consumer then received the Gross/Sirlin Letter representing that Connect America had been established "since 1977" in order to "deceive consumers into thinking Connect America is actually Life Alert or another competitor that has been in existence for many years." [SOF ¶¶ 90, 95, 99, 118-19, 122-24; *see also* 2013 FAC (SOF ¶ 106) at ¶ 49.]

Moreover, Life Alert specifically alleged instances of false advertising that involved Connect America's wrongful use of "Life Alert Marks" and "I've Fallen Marks" in the 2013 FAC. [*See* 2013 FAC (SOF ¶ 106) at ¶ 39(b) ("Connect America continued to Infringe Life Alert's trademarks by . . . the use by Connect America's dealer, medial Guardian, LLC of Life Alert's trademarks in blogs that were part of Connect America's advertising campaign"); ¶ 39(c) ("Connect America continued to Infringe Life Alert's trademarks by . . . providing salespersons with telemarketing scripts that referenced Life Alert's trademark 'I've Fallen and I Can't Get Up!'"); ¶ 64(b) ("Connect America and LifeWatch . . . jointly obtained customers for personal emergency response services through illegal and fraudulent telemarketing operations [which] included . . . hiring salespersons with advertisements referencing Life Alert's trademark 'I've Fallen and I Can't Get Up!'").]

Indeed, the WHEREFORE clause to the 2013 FAC specifically sought an injunction from Connect America and Mr. Gross from:

> ➢ "Using [the "Life Alert Marks" and "I've Fallen Marks"] or any colorable imitation thereof, or any other name or mark likely to cause confusion, mistake, or deception, in connection with telemarketing or the sale . . . ***advertising, or promotion*** of their goods or services." [*Id.* at Wherefore ¶ 3(a) (emphasis added).]

> ➢ "Engaging in any other activity that dilutes the distinctive quality of the Life Alert Marks or the I've Fallen Marks in connection with the sale . . . ***advertising, or promotion*** of its goods or services." [*Id.* at Wherefore ¶ 3(e) (emphasis added).]

In sum, the false advertising allegations "arise out of, are based upon, or are attributable to" Life Alert's allegations of trademark infringement and dilution such that coverage is barred in its entirety as to Connect America Holdings and Connect America, to whom the Trademark Infringement Exclusion applies.

### F.     Coverage is Barred by the Prior Knowledge Exclusion

Pursuant to Endorsement 1, Section 7, of the Policy, the "Application shall be deemed attached to, and incorporated into, this Policy."  [SOF ¶ 154.]  Paragraph 9 of the Application is entitled "Prior Knowledge" and it states:

> Does any person or entity proposed for coverage have any knowledge of or information concerning any actual or alleged act, error, omission, fact or circumstance which may result in a claim that may fall within the scope of coverage applied for?
>
> If "Yes", attach Complete details.
>
> **IT IS AGREED THAT ANY CLAIM ARISING FROM, BASED UPON, OR ATTRIBUTABLE TO ANY ACTUAL OR ALLEGED ACT, ERROR, OMISSION, FACT OR CIRCUMSTANCE OF WHICH ANY SUCH PERSON OR ENTITY HAS ANY KNOWLEDGE OR INFORMATION WILL BE EXCLUDED FROM COVERAGE UNDER THE PROPOSED INSURANCE.**

[SOF ¶ 155.]

Under the circumstances, there can be no dispute that both Mr. Gross and Mr. Leighton – both former CEOs of Connect America and currently the Executive Chairman and President, respectively – had prior knowledge of "actual or alleged act[s], error[s], omissions[s], fact[s], or circumstance[s]" with respect to the factual allegations and claims in the 2008/2009 Action and the conduct proscribed in the 2009 Permanent Injunction, which "may [and, in fact, did] result in a claim that may fall within the scope of the coverage applied for."

Pennsylvania courts routinely enforce prior knowledge exclusions based on an insured's prior knowledge of claims or circumstances which reasonably should have been expected to give

rise to a claim. *See Ettinger & Assoc., LLC v. Hartford/Twin City Fire Ins. Co.*, CIV.A. 12-3274, 2014 WL 2134599 (E.D. Pa. May 22, 2014) (enforcing prior knowledge exclusion to bar claims-made professional liability coverage for an attorney sued for malpractice by his former clients after those clients and the attorney were sued in a Dragonetti action based on the lawyer's legal advice) (citing *Selko v. Home Ins. Co.*, 139 F.3d 146 (3d Cir.1998)); *Westport Ins. Corp. v. Hanft & Knight*, 523 F. Supp. 2d at 444, 458 (M.D. Pa. 2007); *Fishman v. Hartford*, 980 F. Supp. 2d 672, 681 (E.D. Pa. 2013) ("[P]rior knowledge provisions, similar to the one at issue in this Policy, have routinely been upheld.").

Moreover, under Pennsylvania law, Arch is not required to prove "prejudice" as a result of any non-disclosure based on the insured's prior knowledge given that Arch is *not* seeking to rescind the Policy, but rather Arch is simply seeking to enforce the above Prior Knowledge Exclusion that is expressly incorporated into the Policy. *See Hanft & Knight, P.C.*, 523 F. Supp. 2d at 457-58 ("[T]he prior knowledge exclusion operates to bar coverage independent of any policy application . . . . The very authority cited by the [the insureds] refutes their argument and explains that an insurer need not show that it was prejudiced by an insured's non-disclosure before invoking the prior knowledge exclusion.")

For the reasons discussed above and in Arch's Statement of Undisputed Facts, it is clear that Connect America, through the knowledge of both of its CEOs, had prior knowledge of the trademark infringement and false advertising allegations set forth in the 2013 FAC prior to that Claim and prior to Arch issuing the Policy. Accordingly, on this additional basis, Plaintiffs' Claim for coverage is precluded.

**IV.     CONCLUSION**

For the reasons set forth above and in Arch's Statement of Undisputed Facts, Defendant

Arch Insurance Company respectfully requests that this Court grant Arch's Motion for Summary

Judgment and dismiss Plaintiffs' complaint with prejudice.

Dated:     May 1, 2015                              HANGLEY ARONCHICK SEGAL
                                                    PUDLIN & SCHILLER

                                        By:  /s/ Ronald P. Schiller
                                             Ronald P. Schiller
                                             Daniel J. Layden
                                             Matthew N. Klebanoff
                                             One Logan Square, 27th Floor
                                             Philadelphia, Pennsylvania 19103
                                             (215) 568-6200
                                              rschiller@hangley.com
                                              dlayden@hangley.com
                                              mklebanoff@hangley.com

                                             *Counsel for Defendant*
                                             *Arch Insurance Company*