**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CONNECT AMERICA HOLDINGS, LLC,** | : | **CIVIL ACTION** |
| **CONNECTAMERICA.COM, LLC and** | : | |
| **KENNETH GROSS** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ARCH INSURANCE COMPANY** | : | **No. 14-4784** |

<u>**MEMORANDUM OPINION**</u>

**Savage, J.**                                                                      **March 31, 2016**

The central question in this insurance coverage action is whether the claims asserted in a 2013 lawsuit against the plaintiffs Connect America Holdings, LLC ("CA Holdings"), ConnectAmerica.com, LLC ("ConnectAmerica.com"), and Kenneth Gross (collectively, "Connect") are interrelated to claims that had been asserted in a lawsuit filed and settled five years earlier. If they are related, the interrelated wrongful acts exclusion in the claims-made policy issued by the defendant Arch Insurance Co. ("Arch") bars coverage.

Connect has moved for partial summary judgment on the issue of whether Arch properly denied coverage for an action in which Connect was sued by Life Alert Emergency Response, Inc. ("Life Alert") for trademark infringement, unfair competition, false advertising, and other related claims. Arch has filed a cross motion for summary judgment.

We conclude that the wrongful acts alleged in the two lawsuits are not related within the meaning of the policy. However, there are other policy provisions that may preclude or limit coverage. Whether they do depends on credibility determinations and

the resolution of disputed material facts.  Therefore, we shall deny Arch's motion and grant Connect's motion as they relate to the interrelated wrongful acts exclusion.

### Factual Background

Life Alert and Connect are competitors in the medical alert response systems market.  To preserve its dominant position in the market, Life Alert has sued or threatened to sue Connect when it believed Connect was infringing on its well-known trademarks, "Life Alert" and "I've Fallen," and was misleading consumers by creating the impression that Connect is Life Alert.

In 2004, Life Alert accused Connect of trademark infringement and dilution, and unfair competition.[1]  It charged that Connect was using Life Alert's trademarks "Help, I've Fallen and I Can't Get Up" and "Life Alert" to promote, advertise, distribute and sell Connect's medical alert systems.[2]  The marks appeared in metatags of Connect's website, MedicalAlarm.com, and in search terms on the internet.[3]  Faced with the threat of litigation, Connect agreed to cease and desist from using the marks.[4]

Four years later, on July 14, 2008, Life Alert filed a complaint against Connect and two other defendants in the United States District Court for the Central District of California.[5]  In that complaint, Life Alert alleged that ConnectAmerica.com, CVS

---

[1] Arch Statement of Undisputed Facts ("Arch SUF") ¶ 21; Connect Statement of Undisputed Facts ("Connect SUF") ¶ 101.

[2] Arch SUF ¶¶ 24-25; Connect SUF ¶ 101.

[3] Arch SUF ¶¶ 22, 25; Connect SUF ¶¶ 101-02.

[4] Arch SUF Ex. 18.

[5] Arch SUF ¶ 31; Connect SUF ¶ 103.  *See* Complaint, Doc. No. 1, Civ. A. No. 08-4586 (C.D. Cal.) ("2008 Compl.").

Caremark Corp., and CVS Pharmacy, Inc. violated Life Alert's trademarks.[6]   The complaint asserted three causes of action: (1) federal trademark infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114; (2) unfair competition and false designation of origin under § 43 of the Lanham Act, 15 U.S.C. § 1125(a); and (3) unfair competition in violation of California law.[7]   The 2008 complaint was dismissed without prejudice on May 6, 2009 for failure to comply with a scheduling order.[8]

Approximately one month later, on June 9, 2009, Life Alert filed an almost identical complaint in the same court.[9]   The 2009 action named the same defendants as the 2008 action and added Kenneth Gross, Connect's CEO.[10]   The complaint stated the same three causes of action as did the 2008 complaint.[11]   It alleged the defendants had violated Life Alert's trademarks through: "(a) sponsored internet advertisements, (b) internet keyword searches, metatags, source code and web pages for their websites, and (c) inquiries by potential customers to the '1-800' telephone number for the products and services being sold by Defendants."[12]

Connect and Life Alert settled the 2009 action for a payment of $375,000 and the entry of a permanent injunction enjoining Connect from using Life Alert's trademarks.[13]

---

[6] Arch SUF ¶ 32; Connect SUF ¶ 104.

[7] *See generally* 2008 Compl.

[8] Arch SUF ¶ 35; Connect SUF ¶ 106.

[9] Arch SUF ¶ 36; Connect SUF ¶ 107.   *See* Complaint, Doc. No. 1, Civ. A. No. 09-4094 (C.D. Cal.) ("2009 Compl.").

[10] Arch SUF ¶ 37; Connect SUF ¶ 107; *see generally* 2009 Compl.

[11] Connect SUF ¶ 109; Arch SUF ¶ 42; *see generally* 2009 Compl.

[12] Connect SUF ¶ 108; 2009 Compl. ¶ 17.

[13] Connect SUF ¶ 110; Arch SUF ¶ 78.

Gross was not a party to the settlement agreement.[14]   Pursuant to the settlement agreement, a final judgment and a permanent injunction were entered on September 25, 2009.[15]

On May 14, 2013, Life Alert filed the lawsuit at the core of this dispute.  Life Alert sued ConnectAmerica.com and its CEO, Kenneth Gross, in the United States District Court for the Central District of California.[16]  Also named as defendants were LifeWatch, Inc., Evan Sirlin, Live Agent Response 1 LLC, Greg Small, Trilogy Investment, LLC, and ten John Does.[17]  The complaint stated four causes of action: (1) unfair competition and false designation of origin in violation of § 43 of the Lanham Act, 15 U.S.C. § 1125(a); (2) unfair competition under California statutory and common law; (3) federal trademark infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114; and (4) trademark dilution under 15 U.S.C. § 1125(c).[18]

The complaint alleged Connect and LifeWatch engaged in an illegal and fraudulent telemarketing operation that infringed Life Alert's trademarks, including the name "Life Alert" and the trademark "Help, I've Fallen and I Can't Get Up!"[19]  Life Alert asserted Connect and LifeWatch, through the co-defendants, called potential customers, sometimes using false caller identifications, representing they worked for

---

[14] Connect SUF ¶ 111; Arch SUF ¶ 81.

[15] Connect SUF ¶ 112; Arch SUF ¶ 85.

[16] Arch SUF ¶ 103; Connect SUF ¶ 6.  *See* Complaint, Doc. No. 1, Civ. A. No. 13-3455 (C.D. Cal.) ("2013 Compl.").

[17] *See generally* 2013 Compl.

[18] Connect SUF ¶ 8; s*ee generally* 2013 Compl.

[19] 2013 Compl. ¶¶ 26-32.

"Life Alert" or the "I've Fallen and I Can't Get Up!" company.[20]   Only after customers purchased the equipment and received a letter from Gross and Evan Sirlin, LifeWatch's CEO, were the true identities of Connect and LifeWatch revealed.[21]   Connect also placed robo-calls to existing Life Alert customers urging them to update their equipment. Customers who purchased the new equipment received Connect equipment instead of Life Alert's.[22]

The complaint was amended to add a cause of action for false advertising under 15 U.S.C. § 1125(a).[23]   The amended complaint added two new defendants, Michael Hilgar and Worldwide Info Services, Inc.[24]   It included additional details of Life Alert's claim regarding the phone scam.[25]   Life Alert alleged Connect, which had only started business in 2004, falsely claimed on its website and in other media it was the original medical alert company that had been providing emergency response services since 1977.[26]

One of the trademarks at issue in the 2013 action was "Life Alert Mobile," which did not exist at the time the 2009 action was dismissed.[27]   Life Alert, in the 2013 action, did not seek damages for violation of the 2009 injunction.[28]

---

[20] *Id.* ¶ 28(a)-(b).

[21] *Id.* ¶ 28(c).

[22] *Id.* ¶ 28(d).

[23] *See* First Amended Complaint, Doc. No. 37, Civ. A. No. 13-3455 (C.D. Cal.).

[24] *Id.*

[25] *See id.* ¶¶ 63-105.

[26] *Id.* ¶¶ 42-44.

[27] Connect SUF ¶ 122.

[28] *Id.* ¶ 123.

Connect settled the 2013 action.[29]  The settlement required Connect to pay $2.5 million to Life Alert immediately and deposit $2.5 million into escrow, subject to recoupment for monies recovered from other defendants.[30]  Connect incurred defense costs of $200,000.[31]  Gross made no contribution to the monetary settlement.[32]

At the time the 2013 action was filed, Connect was insured by Arch for directors, officers, and organization liability.  When Connect sought coverage,[33] Arch advised that, subject to a full reservation of rights, coverage was limited to Gross because the trademark infringement exclusion precluded coverage for CA Holdings and ConnectAmerica.com.[34]  It later reiterated its coverage position when it requested that Connect provide copies of all pleadings between Connect and Life Alert.  It also asked why First Mercury Insurance Co., Connect's commercial general liability carrier, had denied coverage.[35]

Citing the policy's interrelated claims provision and the interrelated acts exclusion, Arch contended that the 2013 action, the 2008 and 2009 actions, and the 2004 cease-and-desist letter from Life Alert to Connect were interrelated.[36]  Thus, Arch denied coverage on February 6, 2014.

---

[29] Arch SUF ¶¶ 135-36.

[30] *Id.* ¶¶ 136, 139, 148.

[31] *Id.* ¶ 150.

[32] *Id.* ¶ 137.

[33] *Id.* ¶ 157; Connect SUF ¶ 9.

[34] Arch SUF ¶ 165.

[35] *Id.* ¶¶ 173-75, 186.

[36] *Id.* ¶¶ 198, 202; *see id.* Ex. 16, Aug. 6, 2004 cease-and-desist letter.

Connect then filed its complaint in this action, alleging Arch breached the policy and acted in bad faith in denying coverage. After concluding discovery, Arch moved for summary judgment, arguing that the policy's interrelated claims provision, the prior acts exclusion, the trademark infringement exclusion, and the prior knowledge exclusion preclude coverage. It also contends Gross has no claim for loss under the policy. Connect has filed a motion for partial summary judgment, contending that the provisions upon which Arch relies do not bar coverage.

## Standard of Review

The interpretation of an insurance contract is a question of law. *Am. Auto. Ins. Co. v. Murray*, 658 F.3d 311, 320 (3d Cir. 2011) (citations omitted). Whether a claim is within a policy's coverage or barred by an exclusion may be determined on a motion for summary judgment. *Bishops, Inc. v. Penn Nat'l Ins.*, 984 A.2d 982, 989 (Pa. Super. 2009) (quoting *Nationwide Mut. Ins. Co. v. Nixon*, 682 A.2d 1310, 1313 (Pa. Super. 1996)).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In examining the motion, we must draw all reasonable inferences in the nonmovant's favor. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir. 2003).

**The Policy**

Arch issued a Corporate Canopy Policy - Private Company Management Liability & Crime Insurance Policy, No. PCD0042010-02, to CA Holdings, providing a five million dollar limit of liability with a $20,000 retention for directors and officers claims.[37]   The policy was a renewal policy, covering the period from December 24, 2012 to December 24, 2013.  Arch had issued similar policies annually, starting December 24, 2010.[38]

The policy is a "claims-made" policy, limiting coverage to defined claims made against the insured during the policy period.[39]   Claims-made policies are intended to exclude coverage for claims arising out of or related to pre-existing disputes and to avoid multiple policies applying to multiple disputes that are related.  To accomplish these goals, claims-made policies typically contain provisions excluding coverage for disputes that arose prior to the inception of the policy period.  The Arch policy contained these typical provisions which are at issue in this case.

The policy does not obligate Arch to defend Connect.[40]   Rather, Connect has the option either to defend itself against claims or to request Arch to provide a defense.[41]  Defense costs, including attorneys' fees, are included as part of the loss up to the limit of liability, or five million dollars.[42]

---

[37] Arch SUF ¶ 2; Connect SUF ¶ 1.  *See* Arch SUF Ex. 2, Corporate Canopy Policy - Private Company Management Liability & Crime Insurance Policy, No. PCD0042010-02 (the "Policy").

[38] Connect SUF ¶ 4.

[39] Arch SUF ¶ 17.

[40] Arch SUF ¶ 14; Policy, Endorsement 19.

[41] Arch SUF ¶ 14; Policy, Endorsement 19.

[42] Arch SUF ¶ 14; Policy, Endorsement 19.

Connect elected to retain its own attorneys to defend the 2013 action. Nevertheless, Arch did not relinquish total control of the litigation. Connect was required to cooperate with Arch by providing all information requested. It needed Arch's consent to settle any claim.[43]

### Interrelated Acts

Arch argues that because the 2013 action is based on the same violations as were alleged in the 2004 cease-and-desist letter and the 2009 action, the interrelated wrongful acts and the interrelated claims provisions bar coverage. It contends the 2009 and 2013 actions involve "the exact same 'misstatements' and 'misleading statements.'" Connect, on the other hand, contends the two actions are not related and do not share the common nexus required by the policy. It asserts there are no causally connected facts or circumstances.

If the conduct alleged in the 2013 action is related to the conduct alleged in the earlier 2009 action, the interrelated wrongful acts and the prior acts exclusions relieve Arch from covering the claim. If it is not related, those provisions do not bar coverage. Thus, the dispositive inquiry is whether the wrongful acts alleged in the 2004 cease-and-desist letter and the 2009 lawsuit are "interrelated," within the meaning of the policy, to the wrongful acts alleged in the 2013 lawsuit.

Before we compare the allegations in the 2009 and 2013 actions, we first examine the policy language. In interpreting policy provisions, we must give effect to the plain language of the insurance contract read in its entirety. *Am. Auto Ins. Co.*, 658 F.3d at 320 (citation omitted). When the policy language is ambiguous, the provision is

---

[43] Policy, Gen'l Provisions, § 8.E.

construed in favor of the insured.  *Ramara, Inc. v. Westfield Ins. Co.*, --- F.3d ----, No. 15-1003, 2016 WL 624801, at *9 (3d Cir. Feb. 17, 2016) (citation omitted); *Pa. Nat'l Mut. Cas. Ins. Co. v. St. John*, 106 A.3d 1, 14 (Pa. 2014) (quoting *401 Fourth St., Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005)).  "Contract language is ambiguous if it is reasonably susceptible to more than one construction and meaning." *Pa. Nat'l*, 106 A.3d at 14 (citing *Lititz Mut. Ins. Co. v. Steely*, 785 A.2d 975, 978 (Pa. 2001)).  However, policy language may not be stretched beyond its plain meaning to create an ambiguity. *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 164 (3d Cir. 2011) (citations omitted); *Trizechahn Gateway LLC v. Titus,* 976 A.2d 474, 483 (Pa. 2009) (citation omitted).

Where the insurer relies on a policy exclusion as the basis for denying coverage, the insurer has the burden of proving that the exclusion applies.  *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) (citing *Koppers Co. v. Aetna Cas. and Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996)); *Wolfe v. Ross*, 115 A.3d 880, 884 (Pa. Super. 2015) (citing *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007)).   Policy exclusions are strictly construed against the insurer. *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 206-07 (3d Cir. 2001) (citing *Selko v. Home Ins. Co.*, 139 F.3d 146, 152 n.3 (3d Cir. 1998)); *Peters v. Nat'l Interstate Ins. Co.*, 108 A.3d 38, 43 (Pa. Super. 2014) (quoting *Swarner v. Mut. Ben. Grp.*, 72 A.3d 641, 644-45 (Pa. Super. 2013)).

There are three separate provisions that must be read together: the Pending and Prior Litigation Exclusion; the Prior Acts Exclusion; and the Interrelated Wrongful Acts definition.

The "Pending and Prior Litigation Exclusion" provides that Arch will not cover any loss for a claim "arising from, based upon, or attributable to":

> a.    [any] written demand, suit or proceeding made or initiated against any Insured within the scope of a Directors and Officers Liability, Employment Practices Liability, Fiduciary Liability, or similar management liability insurance policy (whether covered or not) on or prior to the applicable Pending and Prior Litigation Date in Item 6 of the Declarations [or]
>
> b.    [any] Wrongful Act specified in such prior demand, suit or proceeding or any Interrelated Wrongful Acts thereof[.][44]

This general policy provision directs us to the applicable liability coverage.  In this case, it is Directors, Officers and Organization Liability.  Endorsement 11, "Prior Acts Exclusion (D&O)," reads:

> Regarding the Directors, Officers, & Organization Liability Coverage Part, it is agreed that the Insurer shall not pay Loss for any Claim against an Insured arising from, based upon, or attributable to:
>
> a.    any Wrongful Act occurring on or prior to the Prior Wrongful Acts Date specified below [December 24, 2012]; or
>
> b.    any Interrelated Wrongful Acts thereto.[45]

These provisions operate to treat all related claims as a single claim and to relate them back to when the first claim arose.[46]  In other words, claims for wrongful acts that are related to wrongful acts that occurred before the policy's inception date are not covered.

For purposes of applying the interrelated claims provision, the policy defines "Interrelated Wrongful Acts" as "Wrongful Acts that have as a common nexus any fact,

---

[44] Policy, Directors, Officers, and Organization Liability Coverage Part ("D&O Part"), § 4, Exclusions ¶ A.2 as amended by Endorsement 2, § 23.

[45] Policy, Endorsement 11.

[46] Policy, Gen'l Provisions, § 10.

circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes."[47]

Connect and Arch dispute the meaning of the term "common nexus."  Connect contends that it requires a causal connection between wrongful acts.  Arch counters that this interpretation renders the terms "cause" and "causally connected" superfluous.  Arch interprets the term broadly, arguing that "common nexus" requires simply "any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes" in common between wrongful acts.

The linguistic dispute is real.  It is not contrived.  The meaning of "common nexus" is not clear.  Given this ambiguity, the exclusion provision is construed against Arch as the insurer.

The term nexus is not defined in the policy.  The common dictionary meaning is connection, causal link, and a connected group or series.  *See Nexus*, Merriam-Webster's Collegiate Dictionary (11th ed. 2005).  Black's Law Dictionary defines nexus as "[a] connection or link, often a causal one."  *Nexus*, Black's Law Dictionary (9th ed. 2009).

Drawing on these definitions, we conclude that a common nexus requires a link between the acts.  For acts to be deemed interrelated, they need not be identical.  But, they must be sufficiently related or similar.  They must be connected together in such a way that they are linked.  Otherwise, they are not related.

---

[47] *Id.*, Definitions, 2.N.

Having interpreted the policy language, we now analyze the two actions to discern the relationship, if any, between the acts alleged in each.  There is no dispute that both lawsuits asserted causes of action for trademark infringement, Lanham Act violations, unfair competition and false advertising.  Both claimed that Connect had the same goal—to lure potential and existing customers from Life Alert.  Both accused Connect of deliberately causing confusion, mistake and deception by associating Connect with Life Alert to benefit from Life Alert's well-known marks.  Both relate, in part, to the same trademarks, except the 2013 action includes an additional one, "Life Alert Mobile."

Despite the similarities, there are differences.  Although the goal was the same, the means used in each scheme were different.  Connect's conduct alleged in each action was different.  The 2009 complaint alleged that Connect diverted customers from Life Alert by using metatags of its website and engaging in other internet activities.  The 2013 amended complaint alleged that Connect employed a telemarketing scheme.  That scheme did not begin until August 2012, more than three years after the earlier lawsuit was resolved and Connect had stopped its wrongful conduct.  In short, the alleged acts were different and occurred at different times.

Significantly, the 2013 false advertising claim was not based on any trademark infringement.  The 2013 action stated a false advertising claim arising from Connect's representing itself as having been in business for over thirty-five years when it had not been.  Arch argues that although the complaint in the 2009 action did not allege that Connect had misrepresented its longevity, evidence developed in discovery in that case revealed that it had.

The 2009 action and the 2013 action involved six trademarks. The 2013 action included a claim for infringement of the trademark "Life Alert Mobile," which did not exist in 2009. There was no similar claim asserted in the 2009 action. This claim was related to conduct that occurred years after the 2009 action was terminated.

None of these facts—the similarities and the dissimilarities of the two actions—are in dispute. The dispute is whether, despite the dissimilarities, the acts are sufficiently related to fall within the policy's exclusions.

The focus of the interrelatedness inquiry is on the acts, not on the parties or the goals. The gravamen of the 2013 action is that Connect engaged in a phone scam and in false advertising regarding its experience in the medical alert industry. Neither one of these claims is asserted in either the 2004 cease-and-desist letter or the 2009 action, which focused on Connect's use of Life Alert's marks on its website and other internet media, and in responses to telephone inquiries made by customers to Connect's "1-800" number.

The 2013 amended complaint does reference Connect's use of Life Alert's marks on the internet. But, it does not relate the past internet activity to the wrongful acts alleged in the 2013 action. The reference does not create the requisite common nexus because it does not form the basis of the 2013 action. Nor is it sufficient that the same plaintiff, some of the same defendants, and some of the same trademarks were involved.

The time that transpired after the internet scheme ended and the telemarketing scheme began, and the different conduct forming the basis of the 2009 action and that complained of in the 2013 amended complaint militate against a finding of a nexus. *See*

*ACE Am. Ins. Co. v. Ascend One Corp.*, 570 F. Supp. 2d 789, 800-01 (D. Md. 2008) (no "common nexus" where claims differed in "scope and time"); *see also KB Home v. St. Paul Mercury Ins. Co.*, 621 F. Supp. 2d 1271, 1278 (S.D. Fla. 2008).  The later acts are not part of a continuous course of conduct that had begun earlier.  The 2013 action alleged a new and different scheme taking place at a different time.  The scheme was not part of the one occurring years earlier that was alleged in the 2009 action.

In the 2009 action, Life Alert sought and secured a permanent injunction.  It did not do so in the later action.  In fact, it did not assert in the 2013 action that Connect had violated the 2009 injunction.  Had it, there would be no question of the interrelatedness of the conduct alleged in the two actions.

Why Life Alert did not seek to enforce the 2009 injunction when it filed the 2013 action reveals differences between the two actions.  In his declaration, Life Alert's counsel in the 2013 action, Ralph Loeb, explained that he did not consider the two cases related.  He declared that "none of those cases [2008, 2009 and 2013] arose from the same or a closely related transaction, happening or event, or called for a determination of the same or substantially related or similar questions of law and fact . . . ."[48]  Accordingly, he did not file a related case notice when he filed the second action.

Loeb's opinion that the actions were not related is not dispositive.  Nevertheless, it does offer insight into why Life Alert did not consider them related.  It accentuates the differences of the alleged wrongful acts in the cases.

_____

[48] Loeb Decl. ¶ 19.

In sum, the wrongful acts giving rise to the 2013 action do not arise from, are not based upon and are not attributable to wrongful acts alleged in the 2004 cease-and-desist letter or the 2009 complaint.  The wrongful acts asserted in the 2004 cease-and-desist letter and the 2009 complaint are not the same wrongful acts that form the basis of the 2013 action.  Simply put, the acts alleged in the 2013 amended complaint do not share a sufficient connection or link, causal or otherwise, with those alleged in the 2004 cease-and-desist letter or the 2009 action to preclude coverage under the policy.  They are not related.   Therefore, the Pending and Prior Litigation and the Prior Acts exclusions do not bar coverage.

### Prior Knowledge

In the application process, Arch asked whether any person or entity to be insured had "any knowledge of or information concerning any actual or alleged act, error, omission, fact or circumstance which may result in a claim that may fall within the scope of coverage applied for."[49]   The application also requested "complete details" of any such information.[50]   Connect did not respond to the prior knowledge question and attached no supporting documentation.[51]   The application, which was incorporated into the policy, stated in bold, capital letters as follows:

> **IT IS AGREED THAT ANY CLAIM ARISING FROM, BASED UPON, OR ATTRIBUTABLE TO ANY ACTUAL OR ALLEGED ACT, ERROR, OMISSION, FACT OR CIRCUMSTANCE OF WHICH ANY SUCH PERSON OR ENTITY HAS ANY KNOWLEDGE OR INFORMATION WILL BE EXCLUDED FROM COVERAGE UNDER THE PROPOSED INSURANCE.**[52]

---

[49] Arch SUF Ex. 56, Application, ¶ 9.

[50] *Id.*

[51] *Id.*

[52] *Id.*

The parties dispute what Gross knew and when he knew it.  Arch contends that Gross had to have known of Life Alert's potential claim arising out of the phone scheme when the application was made.  Connect argues that there was no reason for Gross to believe that Life Alert would make a claim for the telemarketing program which was unrelated and not causally connected to the 2009 claims.

To fall within the prior knowledge exclusion, the claim need not be related to an earlier claim.  It can be an independent and distinct claim, unrelated to any other.  It need only be one arising out of wrongful acts occurring before the application is made.  Hence, though the claim may not be barred by the interrelated wrongful acts exclusion, it may be precluded by the prior knowledge provision.

The telephone scheme began in August 2012.  The application for renewal was submitted four months later on December 13, 2012.  The policy took effect on December 24, 2012.  Obviously, at the time of the application, Connect and Gross knew about the telemarketing program it conducted in conjunction with LifeWatch.  However, that does not mean that Connect knew it was wrongful or that Life Alert would consider it wrongful.  Nor does it mean that Connect knew Life Alert would make a claim or file suit for any conduct connected to the telemarketing.

What Gross knew and when he knew it are questions for the fact finder.  Therefore, summary judgment is not appropriate on the issue of the applicant's prior knowledge of a scheme that could result in a claim which had to have been disclosed to Arch during the application process.

**Trademark Exclusion**

Arch also invokes the trademark infringement exclusion.  Connect contends that the exclusion does not apply to the false advertising cause of action because the claim does not implicate any of Life Alert's trademarks.  We agree that the false advertising claim under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), is separate and distinct from the trademark infringement claims.

There is no question that the policy excuses Arch from paying any loss for a claim "arising from, based upon, or attributable to infringement of any intellectual property rights, including . . . trademarks, trade names, trade dress, [or] service marks . . . ."[53]  Nor is there any question that the false advertising claim in the 2013 action does not arise from, is not based upon, and is not attributable to Life Alert's trademarks.  Rather, the claim is based on Connect's alleged misrepresentations as to its years of experience in the medical alert industry.

A party may recover damages under § 43(a) of the Lanham Act on a false advertising claim without proving trademark infringement.  Section 43(a) is not limited to trademark protection.  *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28-29 (2003).   Rather, it also provides a remedy for false designations of origin, descriptions and representations made in connection with goods or services.  *Id.* at 29.  Thus, a false advertising claim can stand alone, independent of a trademark infringement claim.  *Zyla v. Wadsworth, Div. of Thomson Corp.*, 360 F.3d 243, 251 (1st Cir. 2004) (citing *Dastar*, 539 U.S. at 28-29).

---

[53] Policy, D&O Part, § 4 Exclusions B.5.

Life Alert alleged that Connect falsely held itself out as having over thirty-five years of experience in the medical alert industry when it had been in business for only about ten years.  The false advertising cause of action is not related to the infringement of any trademark.  Thus, we conclude that the false advertising claim under the Lanham Act is covered under the policy.

### Cooperation Clause

The policy obligated Connect to obtain written consent from Arch to settle a claim.  Arch had a reciprocal obligation not to withhold consent unreasonably.  The policy provides:

> The Insureds shall give to the Insurer all information and cooperation as the Insurer may reasonably request.  Upon the Insurer's request, the Insureds shall attend proceedings, hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and conducting the defense of any Claim.[54]

Arch, invoking the cooperation requirement, contends Connect first notified it of the settlement with Life Alert a month after it had occurred.  Arch complains it had not been invited to participate in the mediation process and had not been aware of settlement demands.  It claims Connect ignored requests for information about the negotiations.

Connect, on the other hand, argues Arch has failed to establish the elements of a breach of the duty to cooperate.  Specifically, Connect contends there was no substantial or material failure to inform Arch of the settlement discussions.  It argues that, in any event, Arch did not suffer any prejudice.

---

[54] Policy, Gen'l Provisions, § 8.E.

Arch maintains Connect never informed it of the Escrow Agreement that was part of the Settlement Agreement.   Contradicting Arch, Connect points to four separate references to the Escrow Agreement in the Settlement Agreement.[55]

The Settlement Agreement and the Escrow Agreement were both executed on January 24, 2014.[56]  Pursuant to the Settlement Agreement, Connect and Gross agreed to pay Life Alert $2.5 million and to refrain from infringing Life Alert's trademarks.[57] Connect paid the $2.5 million.[58]

The Escrow Agreement required Connect and Gross to deposit an additional $2.5 million into an escrow account.[59]  Connect, not Gross, deposited the required funds into the escrow account on February 27, 2015.[60]  Connect was entitled to recoup from the escrow funds any amounts that might be recovered from other defendants in the lawsuit.[61]  Consequently, the extent of Arch's liability for indemnity, if any, remains unknown.

On January 21, 2014, three days before they were signed, Arch received copies of the proposed settlement and escrow agreements from Connect's attorney.[62]  The cover letter specifically requested that Arch "confirm that Arch Insurance does not object

---

[55] *See* Arch SUF Ex. 47, Settlement Agreement, ¶¶ 3.a, 3.b, 5.3, 10.

[56] Joint Stipulation of Undisputed Material Facts ("Joint Stipulation"), Doc. No. 89, ¶¶ 99-100.

[57] *Id.* ¶¶ 101, 110.

[58] *Id.* ¶ 102.

[59] *Id.* ¶ 111.

[60] *Id.* ¶ 119.

[61] *Id.* ¶ 120; *see* Arch SUF Ex. 48, Escrow Agreement, ¶¶ 1.3-1.6.

[62] Joint Stipulation ¶ 105.

to the terms of the settlement as set forth in the Settlement Agreement."[63]  The letter, as did the proposed Settlement Agreement, references the Escrow Agreement.[64]

Arch cannot deny that it knew about the escrow part of the settlement deal when it learned of the proposed settlement.  The Settlement Agreement and the Escrow Agreement, in their respective integration clauses, reference each other.[65]  Connect's attorney provided copies of both agreements to Arch's adjuster and mentioned them to the underwriter.[66]

Arch seizes upon Connect's attorney's January 21, 2014 letter as proof that Connect had requested to settle for $2.5 million, not $5 million.  It points to the language "Connect America has agreed to pay Life Alert the amount of $2,500,000.00 in full settlement of this matter . . . ."[67]  Arch ignores the later sentence which reads "Please confirm that Arch Insurance does not object to the terms of the settlement as set forth in the Settlement Agreement."[68]

The letter is ambiguous, if not misleading.  On one hand, it describes the settlement amount as $2.5 million.  On the other, it asks for consent to settle on the terms "as set forth in the Settlement Agreement."  As we have seen, the Settlement Agreement integrated the Escrow Agreement, which called for an additional $2.5 million

---

[63] *Id.* ¶ 106.

[64] *Id.* ¶¶ 108-09.

[65] *Id.* ¶¶ 112-13.

[66] *Id.* ¶ 114.

[67] *See* Arch SUF Ex. 49.

[68] *See id.*

payment.  At no time did Arch request clarification of this ambiguity.  Nevertheless, the documents it had been supplied provided the clarification.

What is disputed is what Arch knew about the litigation generally and the settlement negotiations specifically.  Connect contends Arch was aware of the process; and, if it was not, it could have easily discovered what was happening.  Arch argues it was kept in the dark until the settlement terms were reached, depriving it of the opportunity to participate in the process, which ultimately required a payment of the liability limit.

Connect's insurance broker referred Arch's adjuster to Connect's defense counsel for information on the lawsuit on September 29, 2013.[69]  Not until five weeks later did the adjuster attempt to contact defense counsel, who failed to respond until almost two months later.[70]  In a November 5, 2013 email, the adjuster requested defense counsel provide him with information regarding the court-ordered mediation, the likelihood of success on Connect's motion to dismiss, and a litigation budget.[71]  He also requested information regarding "settlement demands/offers to date."[72]  Connect's defense counsel did not respond to the request until December 26, 2013, one month after the mediation had concluded.[73]  Nor did Connect.[74]  The adjuster immediately emailed defense counsel, requesting that he keep him "apprised of any developments in

---

[69] Connect SUF ¶ 39.

[70] *Id.* ¶¶ 42, 45.

[71] *Id.* ¶ 42.

[72] Arch Resp. to Connect SUF ¶ 45.

[73] Connect SUF ¶ 45; Arch Resp. to Connect SUF ¶¶ 42, 45.

[74] *See* Arch Resp. to Connect SUF ¶ 42.

the matter, including, but not limited to, discussions and negotiations involving settlement and defense strategy going forward."[75]

The evidence shows there were communication problems and even a failure to communicate at times.  Whether these issues rose to the level of non-cooperation is for the fact finder to determine.

Whether Arch was given a meaningful opportunity to participate in the mediation and settlement process is a disputed issue of material fact.  There is a question whether Arch could have settled the case for less than the liability limit had it been apprised of the settlement discussions and participated in the mediation.  The fact finder must determine whether Connect's failure to communicate and to include Arch in the negotiation process prejudiced Arch.  Thus, summary judgment is not appropriate on the issue of whether Connect breached its duty to cooperate with Arch.

## Allocation

Where there are covered and non-covered losses, Endorsement 19 of the policy calls for an allocation between them "based upon the relative legal exposure of all parties to such matters."[76]  Connect argues Endorsement 19 does not apply and Arch incorrectly applies the "relative legal exposure" test called for in that endorsement.  It contends Arch never informed it or its broker that Endorsement 19, which was not included in the earlier policy, was added to the renewal policy.  It argues that Endorsement 1, which was part of the prior policy, applies.  That endorsement requires an allocation of 100% of defense costs to a covered loss.

---

[75] *Id.* ¶ 47.

[76] Policy, Endorsement 19.

The dispute arises from the substitution of Endorsement 1 for Endorsement 19 when the policy was renewed.  Connect claims it was unaware of the new provision which resulted in a reduction in coverage.  Arch counters that Connect's broker was aware of and agreed to Endorsement 19.  If Connect is correct, the prior allocation provision applies.

Whenever an insurer reduces coverage, it has a duty to advise the insured of the reduction.  *Tonkovic v. State Farm Mut. Auto. Ins. Co.*, 521 A.2d 920, 925 (Pa. 1987).  When it fails to do so, the earlier coverage applies if the insured proves that it had a reasonable expectation of that coverage.  *Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1311-12 (3d Cir. 1994).

Whether Arch informed Connect or its broker of the change by the addition of Endorsement 19 to the renewal policy and, relatedly, whether Connect had a reasonable expectation that Endorsement 1 would continue to apply are disputed factual issues subject to credibility determinations.  Thus, which allocation provision applies cannot be decided on summary judgment.

Arch had determined that Gross, as an individual insured, was entitled to "limited defense cost coverage under the Policy."[77]  He was covered even though Connect was not.  Consequently, Arch had to allocate between covered and non-covered losses and between Connect and Gross.

Assuming the allocation provision in Endorsement No. 19 applies, how Arch allocated is subject to disagreement.  There is nothing in the record explaining how Arch arrived at the ten-percent figure.  There was no analysis.  Thus, it is not possible to

---

[77] Connect SUF Ex. 64 at ARCH0003234.

determine whether the allocation was reasonable and Arch had comported with its contractual obligation.

As we have concluded, the trademark infringement exclusion does not bar defense coverage for the Lanham Act false advertising claim against Gross.  Indeed, Arch recognizes that it does not.  Accordingly, assuming there is no bar to coverage, allocation must be made between covered and non-covered claims.

## Conclusion

The interrelated wrongful acts exclusion does not bar coverage.  However, there are credibility determinations and factual disputes bearing on other policy provisions.  Thus, we shall deny Arch's motion for summary judgment, and grant Connect's motion for partial summary judgment as it relates to the interrelated wrongful acts provision and the trademark infringement exclusion only.